UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SHAW-NAE DIXON, THOMAS CASATELLI,
JEANETTE RIVERA, NATALIA YAKUBOVA,
CHRIS KING, ALISON MARCHESE, on behalf of
AM, JM, and MMV (her minor children), WILLIAM
MORRIS, GEORGE KABBEZ, MARY JOSEPHINE
GENEROSO, SHAW-NAE'S HOUSE, LLC,
SALTY DOG RESTAURANT, LTD, PER TAVERN
CORP. d/b/a THE KETTLE BLACK, and
CARGOSTORK PARTIES, INC. d/b/a DO ME A
FAVOR, INDEPENDENT RESTAURANT
OWNERS ASSOCIATION RESCUE, INC.,

Civil Action No._____ -cv--_____-

                              Plaintiffs,

v.

BILL DE BLASIO, in his official capacity as Mayor
of the City of New York, AND THE CITY OF NEW
YORK,

                              Defendants.

---

**BRIEF IN SUPPORT OF ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINTS AND SEEKING OTHER RELIEF.**

---

**WEINER LAW GROUP LLP**
629 Parsippany Road
P.O. Box 438
Parsippany, NJ 07054-0438
Phone (973) 403-1100
rberutti@weiner.law
Attorneys for Shaw-Nae Dixon, Thomas Casatelli, Jeanette Rivera, Natalia Yakubova, Chris King, Alison Marchese, on behalf of AM, JM, and MMV (her minor children), William Morris, , George Kabbez, Mary Josephine Generoso, Shaw-Nae's House, LLC, Salty Dog Restaurant, LTD, Per Tavern Corp. d/b/a The Kettle Black, and Cargostork Parties, Inc. d/b/a Do Me A Favor, Independent Restaurant Owners Association Rescue, Inc.

Of Counsel and on the Brief:
Ronald A. Berutti - N.J. Atty. I.D. No. 023361992
Clark E. Alpert – N.J. Atty. I.D. No. 025311978

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ................................................................................ i

TABLE OF AUTHORITIES .......................................................................... ii

PRELIMINARY STATEMENT ...................................................................... 1

STATEMENT OF FACTS ............................................................................. 4

LEGAL ARGUMENT .................................................................................... 6

POINT I .......................................................................................................... 6

THE ORDER TO SHOW CAUSE GRANTING A TEMPORARY
RESTRAINING ORDER AGAINST MAYOR BILL DE BLASIO AND THE
CITY OF NEW YORK SHOULD BE ENTERED AS A MATTER OF LAW. ..... 6

    A.    Irreparable Harm Has Been Demonstrated by the Plaintiffs by Virtue
        of the Immediate and Irreparable Injuries to be Suffered Beginning
        Today as a Result of Multiple Constitutional Violations Identified in
        the Moving Papers ................................................................................. 8

    B.    Significantly Serious Questions Going to the Merits ............................. 21

    C.    The Hardships Tip Decidedly Toward the Plaintiffs ............................. 21

    D.    Consideration of Harm to the Public ..................................................... 22

POINT II ...................................................................................................... 22

DEFENDANTS SHOULD BE TEMPORARILY RESTRAINED AND
ENJOINED FROM TAKING ANY FURTHER ACTION TO ENFORCE
ANY OF THE MAYOR'S EMERGENCY EXECUTIVE ORDERS, AS
SUCH ACTIONS VIOLATE NOT ONLY PLAINTIFFS' FUNDAMENTAL
LIBERTY INTERESTS, BUT ALSO THE PRIVILEGES AND
IMMUNITIES CLAUSE OF THE UNITED STATES CONSTITUTION,
AND OTHERWISE ARE WITHOUT LEGAL AUTHORITY UNDER
STATE AND CITY LAW. ................................................................................ 22

CONCLUSION .............................................................................................. 30

i

# <u>TABLE OF AUTHORITIES</u>

<u>**Page**</u>

**Cases**

<u>Alexander v. Louisiana,</u>
  405 U.S. 625 (1972).................................................................................... 11

<u>Arlington Heights v. Metropolitan Housing Dev. Corp.,</u>
  429 U.S. 252 (1977).................................................................................... 11

<u>Columbus Bd. of Ed. V. Penick,</u>
  443 U.S. 449 (1979).................................................................................... 11

<u>Corfield v. Coryell,</u>
  6 F.Cas. 546 (No. 3,230) (CCED Pa. 1825) ............................................ 25, 26, 27

<u>Cruzan v. Dir., Mo. Dep't of Health,</u>
  497 U.S. 261 (1990).................................................................................... 13

<u>Doe v. Rumsfeld,</u>
  297 F.Supp.2d 119 (D.D.C. 2013) .............................................................. 14

<u>Elrod v. Burns,</u>
  427 U.S. 347 (1976)...................................................................................... 9

<u>Goetz v. Windsor Cent. Sch. Dist.,</u>
  698 F.2d 606 (2d Cir. 1983)........................................................................ 18

<u>Grutter v. Bollinger,</u>
  539 U.S. 306 (2003).................................................................................... 10

<u>Immediato v. Rye Neck School Dist.,</u>
  73 F.3d 454 (2d. Cir. 1996)......................................................................... 17

<u>Independent Restaurant Owners Association Rescue et. als v. Bill
De Blasio,</u>
  Supreme Court of the State of New York, County of Richmond,
  Index No. 85155/2021 (September 9, 2021) ............................................... 21

<u>Jacobson v. Massachusetts,</u>
  197 U.S. 11 (1905)............................................................................ 13, 14, 27

Loc. 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. New
    York Shipping Ass'n, Inc.,
    965 F.2d 1224 (2d Cir. 1992) ................................................................. 8

Meyer v. Nebraska,
    262 U.S. 390 (1923)................................................................... 17, 18

Pan Am. World Airways, Inc. v. Flight Engineers' Int'l
    Ass'n, PAA Chapter, AFL-CIO,
    306 F.2d 840 (2d Cir. 1962)................................................................. 7

Peterson v. City of Greenville, S. C.,
    373 U.S. 244 (1963)................................................................... 10, 19

Resol. Tr. Corp. v. Elman,
    949 F.2d 624 (2d Cir. 1991)................................................................. 8

Riggins v. Nevada,
    504 U.S. 127 (1992) ........................................................................ 13

Roberts v. U.S. Jaycees,
    468 U.S. 609 (1984 ................................................................... 15, 16

Rochin v. California,
    342 U.S. 165 (1952) ........................................................................ 13

Rodriguez ex rel. Rodriguez v. DeBuono,
    175 F.3d 227 (2d Cir. 1999)................................................................. 8

Rogers v. Lodge,
    459 U.S. 899 (1982)........................................................................ 11

Roman Cath. Diocese of Brooklyn v. Cuomo,
    141 S. Ct. 63 (2020)................................................................... 9, 27

Saenz v. Roe,
    526 U.S. 489 (1999)........................................................... 25, 26, 27

Schmerber v. California,
    384 U.S. 757 (1966)........................................................................ 13

The Slaughter-House Cases,
    83 U.S. 36 (1872)................................................................... 24, 25

U.S. v. Kozminski,
   487 U.S. 931 (1988)........................................................................................20

Washington v. Davis,
   426 U.S. 229 (1976).................................................................................10, 11

Washington v. Harper,
   494 U.S. 210 (1990)........................................................................................13

Winston v. Lee,
   479 U.S. 753 (1985)........................................................................................12

Winter v. Natural Resources Defense Council, Inc., 555
   U.S. 7 (2008)..............................................................................................7, 22

**Rules**

Fed.R.Civ.P. 65(b)..............................................................................................6

**Constitutional Provisions**

U.S. Const. amend. XIV § 1................................................................................24

## PRELIMINARY STATEMENT

The plaintiffs are individuals, businesses, and a business association (asserting the rights of its numerous members) whose fundamental liberty and property interests, protected by the United States Constitution, are being dramatically harmed in numerous ways by Emergency Executive Order ("EEO") 225, 226, and 228, which were promulgated by Mayor Bill de Blasio ("Mayor'), of the City of New York ("City"), and which take effect today, September 13, 2021. In taking such improper steps, the Mayor has acted in his official capacity at all pertinent times, and he and the City, at all pertinent times, have been State actors acting under color of law.

Although the EEOs are facially of general applicability, the overwhelming evidence supports that they EEOs were promulgated by the Mayor with specific intent to harm the liberty interests of African-Americans and Hispanics in greater degree than members of non-protected classes. If only for that reason, a temporary restraining order must immediately be entered, since, by virtue of the foregoing, the burden of proof as to the validity of such EEOs shifts to the Mayor. Such burden of proof shifts because in addition to these Constitutional violations, his authority to promulgate the EEOs under State and City law, administrative regulations, and the New York City Charter, is in grave doubt.

1

Further, the plaintiffs' fundamental liberty interests in freedom of religion, freedom of bodily health and integrity, freedom of association, freedom to pursue a private professional career of one's choice, freedom to raise one's children, and other rights protected by the Due Process Clause of the United States Constitution, are being trampled in blunderbuss fashion by the EEOs, which impose onerous, coercive, and unlawful burdens on businesses, employees, and patrons of such businesses, such that a temporary restraining order must immediately be entered.

Among the extreme burdens placed on the plaintiffs and others similarly situated is that businesses and their employees are forced to become indentured servants of the Mayor, as they are being forced against their will and their beliefs to inspect the vaccination status and identification of almost each and every person entering their premises, which will stigmatize (among others) the largely unvaccinated minority population; and to do so without compensation, and at significant cost. Among other things, this violates the Thirteenth Amendment of the United States Constitution. For such reason, a temporary restraining order also is appropriate.

The EEOs, if permitted to continue in effect without restraint, will impair many fundamental rights (including those of the plaintiffs, who will suffer particularly great harm), will destroy businesses in the City, will discriminate against large swaths of the population--many on the intended basis of race--and

will compel businesses to increase their costs while their revenues decline, and labor is almost impossible to find. The permanent damage to the plaintiff businesses will not only cause a taking without just compensation, but also constitute irreparable harm for the specific reasons detailed in the Verified Complaint, which also requires entry of a temporary restraining order.

Moreover, the Mayor has acted unlawfully in arrogating unto himself personally the power to run the government and run people's lives. In and of itself, such conduct warrants intervention by this Court to prevent such a fundamental usurpation of proper government function.

Finally, evidence establishes that the emergency under which the Mayor has drawn his powers--to the extent he ever legally maintained such powers--no longer exists. The City, which is a subdivision of the State, has (by far) exhausted the full measure of its police powers under such emergency decree, which first was announced Mary 12, 2021, pursuant to EEO 98. The plaintiffs ask that this Court intervene, pursuant to the Due Process and/or Equal Protection Clauses of the 14th Amendment of the United States Constitution, and/or the Privilege and Immunities Clause thereof, to declare unconstitutional any further enactments of Emergency Executive Orders, or enforcement of existing Emergency Executive Orders, as a result of same.

## STATEMENT OF FACTS

The facts are more fully set forth in the accompanying Verified Complaint and Jury Demand, and in the accompanying declarations of Shaw-Nae Dixon, Jessica Mazurkiewicz, Tom Casatelli, Chris King, Jeanette Rivera, William Morris, Natalia Yakubova, George Kabbez, Alison Marchese, Mary Josephine Genaro, and Robert DeLuca. In the interest of brevity, they are incorporated by reference, and will not be repeated herein. By way of overview, they demonstrate clear illegality of Defendants' conduct, and undeniable and devastating harm to Plaintiffs and their Constitutional rights.

We introduce the plaintiffs as follows:

- Shaw-Nae Dixon is an African-American female owner of Shaw-Nae's Kitchen, whose customer base is mostly African-American, and mostly unvaccinated. Shaw-Nae has been advised that if she takes the vaccine, there is a substantial chance that she will die due to her underlying and mysterious medical condition which actually did kill her once before.

- Tommy Casatelli is an owner of The Kettle Black restaurant. Tommy is a true American hero who has struggled with PTSC since he was the only surviving member of his FDNY company on 9/11/01. The Kettle Black has helped his recovery. But the Mayor's EEOs will cause him to be unable to work unless he gets vaccinated.

4

- Jeanette Rivera is a grandmother of a 4-year-old girl who attends Do Me A Favor gym.  Jeanette has suffered with, and survived, seven brain aneurysms and a stroke.  She cannot be vaccinated, and now will be unable to take her granddaughter to the gym, or otherwise enjoy society.

- Natalia Yakubova is a young and devout Catholic, who refuses to be vaccinated due to her firmly held religious convictions.

- Chris King is another owner of The Kettle Black.  He has natural immunity to Covid-19, which made his getting vaccinated unnecessary and risky.

- Alison Marchese is the mother of three children aged 12-17.  Alison is vaccinated, but will not allow her minor children to be vaccinated.

- William Morris owns Do Me A Favor gym.  Most of its patrons are youth in the Autistic spectrum community.  In solidarity with the parents of such children, Billy will not get vaccinated.

- George Kabbez is an owner of Salty Dog Restaurant.  George will not get vaccinated, under doctor's orders.

- Mary Josephine Generoso is an employee of a Brooklyn restaurant.  She will lose her job because of the EEO, even though she has natural immunity to COVID-19.

- Independent Restaurant Owners Association Rescue, Inc. ("Association") is a not-for-profit 509(c)(3) organization that advocates for approximately 200 independent restaurants in the City of New York.

## LEGAL ARGUMENT

## POINT I

## THE ORDER TO SHOW CAUSE GRANTING A TEMPORARY RESTRAINING ORDER AGAINST MAYOR BILL DE BLASIO AND THE CITY OF NEW YORK SHOULD BE ENTERED AS A MATTER OF LAW.

Numerous grounds exist for entry of a temporary restraining order pending a hearing on the merits against enforcement of EEO 225, 226, and 228. The plaintiffs' constitutional rights are being violated, including but not limited to rights under the First and Fourteenth Amendment and rights to both be free of and not be compelled to perpetrate racial discrimination, such that they will be irreparably harmed in the absence of a temporary restraining order being issued.

Fed.R.Civ.P. 65F(b) provides, in pertinent part:

**(b) Temporary Restraining Order.**

**(1) *Issuing Without Notice.*** The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:

**(A)** specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and

**(B)** the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

6

    **(2) Contents; Expiration.** Every temporary restraining order issued without notice must state the date and hour it was issued; describe the injury and state why it is irreparable; state why the order was issued without notice; and be promptly filed in the clerk's office and entered in the record. The order expires at the time after entry--not to exceed 14 days--that the court sets, unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension. The reasons for an extension must be entered in the record.

    **(3) Expediting the Preliminary-Injunction Hearing.** If the order is issued without notice, the motion for a preliminary injunction must be set for hearing at the earliest possible time, taking precedence over all other matters except hearings on older matters of the same character. At the hearing, the party who obtained the order must proceed with the motion; if the party does not, the court must dissolve the order.

    **(4) Motion to Dissolve.** On 2 days' notice to the party who obtained the order without notice--or on shorter notice set by the court--the adverse party may appear and move to dissolve or modify the order. The court must then hear and decide the motion as promptly as justice requires.

"The purpose of a temporary restraining order is to preserve an existing situation in *statu quo* until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction." Pan Am. World Airways, Inc. v. Flight Engineers' Int'l Ass'n, PAA Chapter, AFL-CIO, 306 F.2d 840, 842 (2d Cir. 1962). "In exercising their sound discretion, courts of equity should pay particular regard to the public consequences in employing the extraordinary measure of injunction." Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 24 (2008). "[T]he traditional standards which govern consideration of an application for a temporary

restraining order … are the same standards as those which govern a preliminary injunction …" Loc. 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. New York Shipping Ass'n, Inc., 965 F.2d 1224, 1228 (2d Cir. 1992). Irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." Rodriguez ex rel. Rodriguez v. DeBuono, 175 F.3d 227, 233-34 (2d Cir. 1999) (internal quotations omitted).

The Second Circuit's standard for issuing a preliminary injunction is well-settled:

> The party seeking the injunction must demonstrate (1) irreparable harm should the injunction not be granted, and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief.

Resol. Tr. Corp. v. Elman, 949 F.2d 624, 626 (2d Cir. 1991).

**A.** **Irreparable Harm Has Been Demonstrated by the Plaintiffs by Virtue of the Immediate and Irreparable Injuries to be Suffered Beginning Today as a Result of Multiple Constitutional Violations Identified in the Moving Papers.**

In addition to the Complaint herein verified by numerous Plaintiffs, numerous Declarations have been submitted herewith which demonstrate the immediate and irreparable harm that will befall the plaintiffs if a temporary restraining order is not granted.

For instance, the Declaration of Natalia Yakubova explains that she has sincerely held religious beliefs that preclude her from getting vaccinated. Thus, she

8

will be barred from restaurants and gyms due to the EEO, in violation of her First Amendment right to the Free Exercise of religion. The United States Supreme Court recently has reiterated that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Roman Cath. Diocese of Brooklyn v. Cuomo, 141 S. Ct. 63, 67 (2020) (*quoting* Elrod v. Burns, 427 U.S. 347, 373 (1976) (plurality opinion)).

Such Declaration alone satisfies the irreparable harm requirement, since there must be a religious exceptions.  However, numerous other Declarations do so as well.

First, the Declaration of Jessica Mazurkiewicz lays out the facts demonstrating that the Mayor's desired-policy of getting greater minority vaccination rates has considerably failed, such that the EEOs were specifically intended to have a greater adverse coercive impact on minorities. More specifically, the Mazurkiewicz Declaration shows that starting January 31, 2021, the Mayor took aim at greater minority participation in the vaccine program. Over the ensuing months, the Mayor's Office and the City Health Department targeted mainly minorities in what were usually "plurality" minority ZIP Codes, with about $125 million in advertising to get members of African-American communities and Hispanic communities to lose their "vaccine hesitancy".

At this time, the amount of minority vaccine recipients is far lower than the

totals for the City as a whole, because they have apparently elected to exercise their constitutional rights concerning unwanted bodily intrusions.   This is most obvious among African-Americans, of whom only 36% in the City are fully vaccinated, and 41% have received at least one vaccination--**meaning that a full 59% of African-Americans in the City will be deprived of most indoor commercial activities due to the EEOs' onerous restrictions**. Thus, in actual terms, with his EEO, the Mayor of New York is turning back the clock almost 60 years, and is telling a significant majority of African-Americans that they literally cannot sit at the lunch counter inside a restaurant. *See* Peterson v. City of Greenville, S. C., 373 U.S. 244, 247 (1963) (African-American plaintiffs deprived of the equal protection of the laws secured to them against state action by the Fourteenth Amendment, when they were denied the ability to sit at a lunch counter and were arrested for same),

"[A]ll racial classifications imposed by government must be analyzed by a reviewing court under strict scrutiny … [meaning] … that such classifications are constitutional only if they are narrowly tailored to further compelling governmental interests." Grutter v. Bollinger, 539 U.S. 306, 326 (2003). This includes the thinly disguised classification here. "A statute, otherwise neutral on its face, must not be applied so as invidiously to discriminate on the basis of race." Washington v. Davis, 426 U.S. 229, 241 (1976). "[A] plaintiff seeking to make out

10

an equal protection violation on the basis of racial discrimination must show purpose". Columbus Bd. of Ed. V. Penick, 443 U.S. 449, 464 (1979), and the cases explain that such purpose is plainly deemed evident in circumstances such as these. "[D]etermining the existence of a discriminatory purpose 'demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" Rogers v. Lodge, 459 U.S. 899, 618 (1982) (quoting Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 266 (1977). "An invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." Washington, supra, 426 U.S. at 242. "Once a prima facie case of invidious discrimination is established, the burden of proof shifts to the State to rebut the presumption of unconstitutional action by showing that permissible racially neutral selection criteria and procedures have produced the monochromatic result." Alexander v. Louisiana, 405 U.S. 625, 631–32 (1972).

Here, the Mayor and City have been directing massive resources toward convincing minorities including Hispanics/Latinos, but mainly African-Americans, to get vaccinated.  At least $125 million went into such campaign, yet by August 16, 2021, when EEO 225 was promulgated, a large majority of African-Americans had not been vaccinated.  As of the effective enforcement date of the EEO, 59% of African-Americans will be subjected to its harsh restrictions, whereas only 44% of

11

the public at large will be so subjected.  A powerful *prima facie* case has been made that the Mayor's policy is directly intended to coerce African-Americans in much greater numbers to get vaccinated, or otherwise they will lose their liberty. The totality of the facts makes certain that it was a purposeful policy initiative by the Mayor to have his EEOs bear more heavily on minorities in general, and African-Americans in particular.  Thus, the burden of proof must shift to the City. In the meantime, enforcement of the presumptively-unlawful EEO will cause irreparable harm to minorities, and must be temporarily restrained pending a full hearing on the merits.

Further, some of the plaintiffs have been advised that the vaccine may kill them (Dixon and Rivera), others have been advised not to get the vaccine (Kabbez), and still others have been advised that they have natural immunity and should not get the shot (King and Generoso). The remaining plaintiffs simply do not want to be injected with a vaccine into their bodies, or their childrens', for a number of other reasons, which is their fundamental constitutional right.

Under the substantive due process clause of the Fourteenth Amendment, individuals possess a constitutional right to be free from forcible physical intrusions of their bodies against their will, absent a compelling state interest. Winston v. Lee, 479 U.S. 753, 266 (1985) (state cannot surgically remove potential evidence from a suspect's body without consent given the severity of the intrusion

and lack of compelling state interest); <u>Schmerber v. California</u>, 384 U.S. 757, 771-72 (1966) (forcible blood-alcohol test constitutional because specific individual's risk of trauma or injury low and state's interest in evidence high). The Fourteenth Amendment undoubtedly protects--as a liberty interest--the right against forcible physical intrusions of the body by the government. <u>Rochin v. California</u>, 342 U.S. 165, 172-73 (1952) (state cannot forcibly pump detainee's stomach to obtain evidence). Although the Supreme Court has declined formally to label its review in this context as "strict scrutiny," *see* <u>Riggins v. Nevada</u>, 504 U.S. 127, 136 (1992), the cases still talk about a "liberty interest", and ask whether the government has adequately demonstrated a "need" (in context, a *compelling* or "essential" need) for the intrusion, a lack of "reasonable alternatives", as well as procedural and medical safeguards, *see* <u>id.</u>; *see also* <u>Washington v. Harper</u>, 494 U.S. 210, 229 (1990) ("The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty" requiring an important and legitimate state interest); <u>Cruzan v. Dir., Mo. Dep't of Health</u>, 497 U.S. 261, 269 (1990) ("This notion of bodily integrity has been embodied in the requirement that informed consent is generally required for medical treatment," but state also has interest in life and informed consent).

<u>Jacobson v. Massachusetts</u>, 197 U.S. 11 (1905), is often cited but has been cabined in later cases' interpretations. In any event, the upreme Court held in

Jacobson that even where there may be what now would be considered to be a compelling interest in having all citizens vaccinated (there, for smallpox), the Court expressly declined to extent that ruling beyond the facts of the case before it. Id. at 39.   Specifically, Justice Harlan asserted, in considering the potentially unconstitutional nature of the statue, it would look only to the one individual before the Court.   "[w]e are not inclined to hold that the statute establishes the absolute rule that an adult must be vaccinated if it be apparent or can be shown with reasonable certainty that he is not *at the time a fit subject of vaccination or that vaccination, by reason of his then condition, would seriously impair his health or probably cause his death.*" Id. (emphasis added). Further, where vaccines are experimental and in their early stages, at least one court has found that a preliminary injunction should issue precluding the compulsory injection of same (into the bodies of armed services members), in keeping with the plaintiffs' rights to bodily integrity. Doe v. Rumsfeld, 297 F.Supp.2d 119 (D.D.C. 2013). Here, the particular showings by plaintiffs (including specific imminent threat to the life and safety to some plaintiffs, and constitutionally-based refusal bases for *all plaintiffs*) are far more powerful.

In light of the above, at the very least there must be an exemption for those plaintiffs with a medical condition, and these with a religious objection.   However, there is no compelling reason to coerce all unvaccinated citizens into getting

vaccinated, in light of the dwindling COVID-19 numbers, and the admitted fact that vaccinated individuals are at almost no risk of death or dangerous outcomes if infected by the unvaccinated. Thus, the EEOs seek to use a 'blunt instrument' to accomplish forcible physical intrusions without compelling need. Irreparable harm will befall the plaintiffs and others similarly situation if the EEOs are not temporarily enjoined, and enforcement thereof restrained.

In addition to the foregoing, the EEOs violate Plaintiffs' rights of association. The United States Supreme Court has "noted that certain kinds of personal bonds have played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs; they thereby foster diversity and act as critical buffers between the individual and the power of the State." Roberts v. U.S. Jaycees, 468 U.S. 609, 618-19 (1984). Moreover, "the constitutional shelter afforded such relationships reflects the realization that individuals draw much of their emotional enrichment from close ties with others. Protecting these relationships from unwarranted state interference therefore safeguards the ability independently to define one's identity that is central to any concept of liberty." Id. "According protection to collective effort on behalf of shared goals is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority." Id. at 622. "The right to associate for expressive purposes is not, however, absolute.

15

Infringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." Id. at 628.

Here, several of the plaintiffs have taken principled stands that under no circumstance will they get vaccinated. For instance, plaintiff Morris closely associates with families in the Autism spectrum community, and wants to stand in solidarity with them (while also working closely with them) in not being vaccinated, because of their belief that their children became autistic after receiving vaccines. No compelling interest permits the Mayor to force Morris and the families attending Do Me A Favor gym, including plaintiff Rivera, out of the premises because they are not vaccinated; thus, their rights to association are violated by the EEOs. Similarly, hundreds of thousands will be kept out of restaurants and other places of business where they associate with vaccinated and unvaccinated alike, with direct resulting harm to the plaintiffs. Suddenly--not even by force of legislation--the Mayor has put a halt to all such indoor association with a stroke of his perceived mighty pen. But such pen is no match for the United States Constitution--which was authored with the mightiest of pens; that of The People--and he must be temporarily restrained and enjoined from completing his strokes of unconstitutional interference with the right of association, and otherwise.

Meanwhile, a most fundamental component of the traditions of our society--the right of parents to raise their children--is massively encroached by the EEOs, in that some 80% of children between 12 and 17 will be unable to engage in most indoor economic activity because they are unvaccinated. Thus, although the overwhelming majority of parents plainly do not want their children vaccinated against COVID-19, and have decided there will be net harm to their children (who are at very low risk otherwise) in taking this gamble with their health, the EEOs are an attempt to coerce them to have their children vaccinated against their wishes--and will succeed, or else their children will be deprived of society.

The right to "establish a home and bring up children" is a recognized liberty interest. Meyer v. Nebraska, 262 U.S. 390, 399 (1923); Immediato v. Rye Neck School Dist., 73 F.3d 454, 462 (2d. Cir. 1996). While Immediato held that a rational basis review must be made of government regulation in that particular case related to educational issues, such that regulations must be reasonable here, the Mayor's interference with parenting is wholly unreasonable and goes to much more fundamental parenting issues--the right to direct a child's medical care. The Mayor is the scold of Gracie Mansion, who wags his finger at the overwhelming majority of parents, who have made considered decisions not to get their specific children vaccinated, as if he knows what is best for the children of all parents.

Such unreasonable interference with parental choice must be enjoined, and there certainly is no compelling reason for such executive action.

The Second Circuit has also recognized that "[l]iberty as guaranteed by the Fourteenth Amendment denotes the right of the individual to engage in the common occupations of life and to enjoy privileges recognized as essential to the orderly pursuit of happiness." Goetz v. Windsor Cent. Sch. Dist., 698 F.2d 606, 609 (2d Cir. 1983); accord Meyer, supra. In contravention of this right, the EEOs command that unvaccinated employers and unvaccinated employees may no longer work inside if they are unvaccinated.  As noted by several of the plaintiffs, they will be put out of business and work, as a result of such oppression imposed by the Mayor's diktat.  Certainly (as the accompanying Complaint verifications and Declarations demonstrate) no compelling state interest supports the Mayor's actions, and the coercive destruction of such liberty interests is altogether irrational and unreasonable. This is especially true in that COVID-19 is dwindling, and only the unvaccinated--something which appears to be a choice among virtually all of the unvaccinated--are a putative danger, and only to themselves. Indeed, this is confirmed by the EEOs preamble, which provides that 98% of COVID hospitalizations and deaths at this time are among the unvaccinated.

The EEO also, by executive fiat, would compel business owners and employees to discriminate against patrons on the basis of health, race, and other

18

protected characteristics. In <u>Peterson</u>, *supra*, a private business was determined to have become a state actor when is was required to segregate lunch counters by city ordinance. By virtue of the Mayor compelling business to discriminate against individuals who are not vaccinated--including a majority of the City's African-Americans--all such businesses are potentially liable to such patrons as State actors for their discrimination, and worse, are being forced to do so against their conscientious belief and abhorrence at being forced to racially discriminate.

In that vein, restaurants, employers, managers, and employees of covered entities all are compelled by the EEOs to work as the Mayor's enforcers of this odious requirement. All customers must be asked for proof of vaccination, and for identification which matches the identity of the individual on the vaccine card. Such forced labor goes against the beliefs and will of the plaintiffs and, based in part on the Association's participation on behalf of its membership, many or most businesses in the City. Further, this will not only violate fundamental rights, but also cause lost productivity and efficiency of businesses and their employees, and the costs of same must be borne by the businesses and their employees without any additional compensation. Meanwhile, unvaccinated employees will be forced out of business, and the short staffs that exist all around the City, due to a national labor shortage, will be further burdened by the work they must perform for the Mayor, under penalty of massive fines for failing to do so.

19

The Thirteenth Amendment of the United States Constitution, in addition to prohibiting the sort of racial discrimination the EEO mandates, also prohibits involuntary servitude of the kind being inflicted on every race in service of the Mayor's edicts. "The Amendment is self-executing without any ancillary legislation, so far as its terms are applicable to any existing state of circumstances." U.S. v. Kozminski, 487 U.S. 931, 942 (1988). The Supreme Court has noted "that in every case in which this Court has found a condition of involuntary servitude, the victim had no available choice but to work or be subject to legal sanction." Id. at 943. Thus, Supreme Court "precedents clearly define a Thirteenth Amendment prohibition of involuntary servitude enforced by the use or threatened use of physical or legal coercion." Id. at 944.

There is no question that the commands of the Mayor are forcing businesses and their employees to labor in a manner which serves the Mayor's unacceptable policy ends, without compensation, and under threat of coercion--which is a ladder of fines starting at $1,000 for the first offense, and eventually climbing to $5,000 per offense thereafter. The true fine level can become astronomical in short order. Yet the Mayor has no authority to impose such work requirements on private citizens either under the United States Constitution, or even under the New York City Charter, which generally limits a Mayor's powers to "orders issued by the Executive, generally employees of the Executive branch, [who] must obey orders

issued by the Executive because those orders represent the will of the executive branch of government which resides in an individual elected by the people." Independent Restaurant Owners Association Rescue et. als v. Bill De Blasio, Supreme Court of the State of New York, County of Richmond, Index No. 85155/2021 (September 9, 2021) at *3. (Berutti Declaration Exhibit A).

**B.      Significantly Serious Questions Going to the Merits.**

It is respectfully submitted that the substantial questions raised herein concerning immediate and wholesale Constitutional violations, are serious enough to merit a temporary restraining order before those violations are allowed to begin. Numerous fundamental constitutional rights of the plaintiffs themselves, and of millions of City residents and visitors to the City, many of which directly impact the plaintiffs' businesses, are implicated by the EEOs. Yet those EEOs are not only unconstitutional, but clearly appear to be completely outside of the Mayor's authority under the City Charter and other State laws and City Administrative regulations (*see* Id. at *2-14).

**C.      The Hardships Tip Decidedly Toward the Plaintiffs.**

The plaintiffs, and those similarly situated, stand to suffer massive harm if the EEOs are permitted to take effect and be enforced.  Defendants will suffer no harm from the issuance of a temporary restraining order other than, arguably, the

Mayor's ability to exercise power that he may have no legal authority to exercise to begin with. *See* Id.

**D.      Consideration of Harm to the Public**

The United States Supreme Court has noted that the public interest must be considered when determining whether to grant an injunction. Winter, *supra*, 555 U.S. 7. There can be no doubt that a public which is being divided into classes of favored and unfavored citizens by a rogue Mayor who is acting under doubtful authority, so as to trample the fundamental constitutional rights of all members of one of such classes. The fact that the Mayor has taken particular aim at suspect classes of minorities is of particular note and public interest, and must be stopped dead in its tracks. For all such reasons, this Court should enter a temporary restraining order barring the enforcement of the EEOs, pending a hearing on the merits of a preliminary injunction.

**POINT II**

**DEFENDANTS SHOULD BE TEMPORARILY RESTRAINED AND ENJOINED FROM TAKING ANY FURTHER ACTION TO ENFORCE ANY OF THE MAYOR'S EMERGENCY EXECUTIVE ORDERS, AS SUCH ACTIONS VIOLATE NOT ONLY PLAINTIFFS' FUNDAMENTAL LIBERTY INTERESTS, BUT ALSO THE PRIVILEGES AND IMMUNITIES CLAUSE OF THE UNITED STATES CONSTITUTION, AND OTHERWISE ARE WITHOUT LEGAL AUTHORITY UNDER STATE AND CITY LAW.**

As noted above, a Justice of the New York Supreme Court just last week issued a sweeping Opinion in which Her Honor, while constrained by the technical

22

limits of the pleadings before her, raised very serious questions about whether the Mayor may take any further actions.  The plaintiffs herein will not further expand on that "Decision and Order" (which speaks for itself), other than to strongly commend it to this Court's attention because it lays out a convincing case that the Mayor is without authority to take emergency actions that impact anything at all, perhaps except the Executive Branch of the City itself.

Moreover, the emergency authority that the Mayor took unto himself with EEO 98, on March 12, 2020, came when there truly was a coronavirus crisis, and the contributing factors, such as forced nursing home intake of COVID-19 patients, were unknown.  Whereas there were hundreds of daily deaths, and thousands of daily hospitalizations due to COVID-19 infections in the early weeks of the pandemic, that was mostly driven by Governor Andrew M. Cuomo's destructive policy of compelling nursing homes to accept the COVID sick--resulting in placement of over 6,000 sick patients in nursing homes, the populations of which homes thereafter were devastated.

Now the numbers of those testing positive, those believed to have COVID, those hospitalized from COVID, and those dying from COVID, are minuscule in comparison.  And the Mayor and City admit that it is the unvaccinated who are the biggest danger--and then only to themselves.  That is their choice, which is constitutionally protected.  No longer do we have the massive and unmanageable

public health crisis that once was.  Despite this sea change, the Mayor now treats the purportedly ongoing crisis as though that change never occurred, and as a way to force all sorts of private conduct to bend to his wishes under his putative emergency powers.  Such actions have reached the point where they have become constitutionally illegitimate conduct pursuant to a State actor's once-legitimate police powers.  They have instead become a vehicle by which the Mayor is evading the United States Constitution (and the very structure of recognizable government) in a "COVID-forever" power grab, that makes the "emergency" perpetual, defeats fundamental liberties, and violates the privileges and immunities of national citizenship of City residents, pursuant to the Privileges and Immunities Clause of the 14th Amendment, or otherwise.

In the latter regard, the Fourteenth Amendment provides, "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States ...." U.S. Const. amend. XIV § 1.  The 14th Amendment's Privileges and Immunities Clause has remained essentially moribund since the Supreme Court's decision in The Slaughter-House Cases, 83 U.S. (16 Wall.) 36 (1872). In The Slaughter-House Cases, the Supreme Court held that "the Privileges or Immunities Clause was not intended "as a protection to the citizen of a State against the legislative power of his own State." Id. at 74. Rather than employ the Privileges and Immunities Clause, the Supreme Court has

respected The Slaughter-House Cases, and has turned to the Due Process Clause as the source of protecting unenumerated rights.

This issue is ripe for revisiting, and we respectfully believe that the Supreme Court will clarify the scope of The Slaughterhouse Cases at its next opportunity. This Court should narrow or even overrule that holding and apply the Privileges and Immunities Clause of the Fourteenth Amendment in further support of Plaintiffs' rights.

In Saenz v. Roe, 526 U.S. 489, 521, 523 (1999) (Thomas, J., dissenting), Justice Thomas engaged in a detailed historical analysis of the Privileges and Immunities Clause of the 14th Amendment, noting that "[l]egal scholars agree on little beyond the conclusion that the Clause does not mean what the Court said it meant in 1873." Justice Thomas traced the Fourteenth Amendment's intended meaning back to a decision authored by Justice Bushrod Washington in Corfield v. Coryell, 6 F.Cas. 546 (No. 3,230) (CCED Pa. 1825), wherein Justice Washington wrote:

> We feel no hesitation in confining these expressions to those privileges and immunities which are, in their nature, fundamental; **which belong, of right, to the citizens of all free governments**; and which have, at all times, been enjoyed by the citizens of the several states which compose this Union, from the time of their becoming free, independent, and sovereign. What these fundamental principles are, it would perhaps be more tedious than difficult to enumerate. **They may, however, be all comprehended under the following general heads: Protection by the government; the enjoyment of life and liberty, with the right to acquire and possess property of**

**every kind, and to pursue and obtain happiness and safety; subject nevertheless to such restraints as the government may justly prescribe for the general good of the whole.** The right of a citizen of one state to pass through, or to reside in any other state, for purposes of trade, agriculture, professional pursuits, or otherwise; to claim the benefit of the writ of habeas corpus; to institute and maintain actions of any kind in the courts of the state; ... and an exemption from higher taxes or impositions than are paid by the other citizens of the state; ... the elective franchise, as regulated and established by the laws or constitution of the state in which it is to be exercised. These, and many others which might be mentioned, are, strictly speaking, privileges and immunities.

Id. at 551–552 (emphasis added).

Justice Thomas continued in his dissent, "When Congress gathered to debate the Fourteenth Amendment, Members frequently, if not as a matter of course, appealed to Corfield, arguing that the Amendment was necessary to guarantee the fundamental rights that Justice Washington identified in his opinion. Saenz, *supra,* 526 U.S. at 526 (Thomas, J., dissenting). Justice Thomas continued:

That Members of the 39th Congress appear to have endorsed the wisdom of Justice Washington's opinion does not, standing alone, provide dispositive insight into their understanding of the Fourteenth Amendment's Privileges or Immunities Clause. Nevertheless, their repeated references to the Corfield decision, combined with what appears to be the historical understanding of the Clause's operative terms, supports the inference that, at the time the Fourteenth Amendment was adopted, people understood that "privileges or immunities of citizens" were fundamental rights, rather than every public benefit established by positive law. Accordingly, the majority's conclusion—that a State violates the Privileges or Immunities Clause when it "discriminates" against citizens who have been domiciled in the State for less than a year in the distribution of welfare benefits—appears contrary to the original understanding and is dubious at best.

Id. at 527 (Thomas, J., dissenting). Justice Thomas then concluded, "Because I believe that the demise of the Privileges or Immunities Clause has contributed in no small part to the current disarray of our Fourteenth Amendment jurisprudence, I would be open to reevaluating its meaning in an appropriate case." Id. at 527–28 (Thomas, J., dissenting).

Extrapolating the logic of Justices Washington and Thomas, it appears that the present case presents an opportunity to examine the original intent of the Privileges and Immunities Clause of the Fourteenth Amendment, and to apply it to the protection of the fundamental rights of the people to be free from the types of executive fiat demonstrated by the Mayor under the guise of using his 'emergency' powers.

In Jacobson, *supra*, the United States Supreme Court provided the philosophical underpinning for States and their legal subdivisions to declare states of emergency related to health crises.  However, although Jacobson has been limited by Roman Catholic Diocese v. Cuomo, *supra*,  and standard fundamental-rights analysis vindicates Plaintiffs' rights here, nowhere can one find a structured and direct curb on police powers in our constitutional jurisprudence. If indeed the Fourteenth Amendment's Privileges and Immunities Clause evolved from Justice Washington's Corfield decision, as Justice Thomas persuasively wrote, then it plainly was intended to protect the fundamental rights of citizens "subject

nevertheless to such restraints as the government may *justly* prescribe for the general good of the whole." (emphasis added). But what of when a State government acts *unjustly*, and abuses its otherwise-legitimate police powers to use a putative "emergency" to crush the fundamental rights of citizens? Do not the citizens' fundamental rights then factor into the equation as the counterbalance? The plaintiffs submit that at such point, the rights of the State's elected officials to engage in arguably legitimate police powers end, and the Privileges and Immunities Clause of the Fourteenth Amendment takes over to protect the fundamental rights of such citizens against such abuse.

Here, the Mayor has so abused and expanded his power, as the purported emergency gets less and less dangerous, and arrogated the power to have perpetual one-man rule under the rubric of "emergency", as to present a clear and present danger to the fundamental rights of the City's residents. Under such circumstances, it is respectfully suggested that the Mayor's emergency decree, and *all* powers he has assumed, are not only unconstitutional under traditional analysis, but now violate the Privileges and Immunities Clause of the Fourteenth Amendment, and are unconstitutional for that reason as well.

Thus, an injunction against the Mayor taking action to enforce *any* of his EEOs is appropriate; and, in the meantime, a temporary restraining order should be

entered precluding any and all such further assumption of emergency powers pending the outcome of this matter on the merits.

## CONCLUSION

For the foregoing reasons, the EEOs all have been shown to intrude upon numerous fundamental constitutional liberty and property interests of the plaintiffs, and otherwise have satisfied the test for imposition by this Court of a temporary restraining order against enforcement of EEOs 225, 226, and 228.

Further, the plaintiffs have shown that the Mayor has exceeded all constitutional authority, even if his power to act under an emergency decree did, at one time, exist, such that any and all further efforts to wield emergency powers arising from the COVID-19 crisis now violate not only the specified rights (and other laws) enumerated in the Complaint, but also the Privileges and Immunities Clause of the Fourteenth Amendment.

Thus, the Mayor and the City should be temporarily restrained and enjoined from engaging in any further acts related to any EEO he has promulgated to date arising out of EEO 98, including such EEO itself.

Respectfully submitted,
**WEINER LAW GROUP LLP**

By: *Ronald A. Berutti*
    Ronald A. Berutti
    A Member of the Firm
    629 Parsippany Road
    P.O. Box 438
    Parsippany, NJ 07054-0438
    Phone (973) 403-1100
    rberutti@weiner.law

Dated: September 13, 2021
2114750