UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHAW-NAE DIXON, THOMAS CASATELLI, JEANETTE RIVERA, NATALIA YAKUBOVA, CHRIS KING, ALISON MARCHESE, on behalf of AM, JM, and MMV (her minor children), WILLIAM MORRIS, GEORGE KABBEZ, MARY JOSEPHINE GENEROSO, SHAW-NAE'S HOUSE, LLC, SALTY DOG RESTAURANT, LTD, PER TAVERN CORP. d/b/a THE KETTLE BLACK, and CARGOSTORK PARTIES, INC. d/b/a DO ME A FAVOR, INDEPENDENT RESTAURANT OWNERS ASSOCIATION RESCUE, INC., <br>                             Plaintiffs, <br> v. <br><br> BILL DE BLASIO, in his official capacity as Mayor of the City of New York, AND THE CITY OF NEW YORK, | **Civil Action No. 1:21-cv-05090-BMC** |

## REPLY MEMORANDUM OF LAW ON BEHALF OF PLAINTIFFS

 

**Ronald A. Berutti, Esq.**
**WEINER LAW GROUP LLP**
629 Parsippany Road
P.O. Box 438
Parsippany, NJ 07054-0438
Phone (973) 403-1100
Attorneys for Plaintiffs

**On the Brief:**
Ronald A. Berutti, Esq.
Gwyneth K. Murray-Nolan, Esq.
Clark E. Alpert, Esq.
2144625_1

# **TABLE OF CONTENTS**

Page

**Contents**

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................... ii

PRELIMINARY STATEMENT .................................................................................... 1

LEGAL ARGUMENT .................................................................................................... 2

POINT I-PROMULGATION OF THE EEOS BY DEFENDANTS WAS ULTRA VIRES ......... 2

POINT II-THE LACK OF RELIGIOUS EXEMPTION IS UNCONSTITUTIONAL. .................. 5

POINT III-THE EEOS MUST FAIL SINCE THE MAYOR HAS NO LEGAL AUTHORITY TO IMPOSE CONDITIONS ON INDIVIDUALS REFUSING EUA SHOTS. ........................................................................................................................... 6

POINT IV-THE EEOS HAVE AN UNCONSTITUTIONAL DISPARATE IMPACT ON MINORITIES. ................................................................................................................. 9

POINT V-DEFENDANTS HAVE FURTHER ENHANCED THE CASE FOR AN INJUNCTION PURSUANT TO THE THIRTEENTH AMENDMENT ...................... 10

POINT VI-DEFENDANTS INCORRECTLY APPLY A GENERAL RATIONAL BASIS STANDARD TO FUNDAMENTAL RIGHTS CLAIMS. ................................ 11

POINT VII-ADDITIONAL FACTORS REVEAL THE EEOS TO BE IRRATIONAL ............. 14

CONCLUSION ............................................................................................................. 15

# TABLE OF AUTHORITIES

**Cases**

*Alma Soc. Inc. v. Mellon,*
   601 F.2d 1225, 1233, 1235 (2d Cir. 1979) .............................................................................. 13

*Butler v. Perry,*
   U.S. 328 (1916) ...................................................................................................................... 11

*Church of Lukumi v. Hialeah,*
   508 U.S. 520, 546 (1993) ......................................................................................................... 5

*Columbus Board of Educ. v. Penick,*
   443 U.S. 449, 464-65 (1979) ................................................................................................. 10

*Cong. Rabbin. Coll. of Tartikov v. Vill of Pomona,*
   915 F. Supp. 2d 574, 616 (S.D.N.Y. 2013). .......................................................................... 10

*Crawford v. Cushman,*
   531 F.2d 1114, 1124-5 (2d 1976) .......................................................................................... 13

*Hayden v. County of Nassau,*
   180 F.3d 42, 50 (2d.Cir. 1999) .............................................................................................. 10

*IROAR v. DeBlasio*
   Supreme Court of New York, County of Richmond, Index No.
   85055/21 ......................................................................................................................... 2, 4, 5

*Jacobson v. Commonwealth of Massachusetts,*
   197 U.S. 11, 39 (1905) ........................................................................................................... 12

*Manisclaco v. New York City Dep't of Educ.,*
   No. 21-CV-5055 (BMC), 2021 WL 4344267 at *3 (E.D.N.Y
   Sept. 23, 2021) ..................................................................................................................... 6, 7

*Riggins v. Nevada,*
   504 U.S. 127 (1992), .............................................................................................................. 12

*Roman Cath. Diocese of Brooklyn v. Cuomo*
   141 S. Ct. 63, 69 (2020) ..................................................................................................... 5, 12

*Selective Draft Law Cases,*
 245 U.S. 366 (1918) .................................................................................................................. 11

*Structural Due Process,*
 10 Harv.C.R.C.L.L.Rev. 269 (1975) ........................................................................................ 13

*U.S. Dep't of Agric v. Moreno,*
 413 U.S. 528, 534 (1973) .......................................................................................................... 14

*United States v. 30.64 Acres Land,*
 795 F.2d. 796 (9th Cir. 1986) ................................................................................................... 11

*Washington v. Davis,*
 426 U.S. 229, 241 (1976) .......................................................................................................... 10

*Women's Health Servs., Inc. v. Maher,*
 514 F. Supp. 265, 272, n.5 (D. Conn 1981) .............................................................................. 13

*Youngstown Sheet & Tube Co. v. Sawyer,*
 343 U.S. 579, 589 (1952) ............................................................................................................ 4

## PRELIMINARY STATEMENT

Defendants are without authority to promulgate or enforce the Emergency Executive Orders ("EEOs") pursuant to New York and City statutes and regulations, or the City Charter. While such ground should be enough to warrant entry of a preliminary injunction in favor of plaintiffs, there are wholesale flaws with the EEOs on the merits which also support such relief.

Critically, defendants have misstated the actual status of vaccines, asserting there to be three FDA "authorized" vaccines, which already once led this Court to hold that there are three available "FDA approved" vaccines. Such is not the case. All or virtually all COVID vaccines currently in the US are only available due to an FDA Emergency Use Authorization ("EUA"). The EUA authorizing statute provides that no one can be forced to take an EUA 'drug'. Moreover, the subject statute is preemptive, and prevents state actors from creating consequences for a person's refusal to take an EUA drug. Defendants have already once caused this Court to believe there to be three FDA approved vaccines, and must correct the record. Meanwhile, as a matter of law, the EEOs violate the EUA enabling statute and must be struck down.

Further, the plaintiffs plainly have made out a *prima facie* case that the EEOs violate the Equal Protection Clause as applied to minorities. The disparate impact on the constitutional rights of minorities was known by the Mayor when promulgating the EEOs, and the Mayor followed such plan knowing that the EEOs was have a much greatly disproportionate impact on the lives and constitutional rights of, most particularly, of African-Americans. Moreover, defendants' application of a rational basis test to questions related to the fundamental rights of those seeking religious exemptions, and to at least some of the bodily integrity claims made by plaintiffs, cannot survive scrutiny. Indeed, in light of the EUA status of vaccines and other information, there is no rational basis at all for the EEOs.

Should defendants succeed in this matter, every political figure looking to gain unilateral power by allegedly 'saving lives' will seek shelter in defendants' success as a basis for doing the same in any 'crisis'. Such is not the nature of our government, and we ask that the Court take this opportunity to hold government accountable to the Constitution and laws by enjoining defendants' overreaching conduct.

## LEGAL ARGUMENT

**POINT I: PROMULGATION OF THE EEOS BY DEFENDANTS WAS *ULTRA VIRES*.**

Defendants claim they have legal authority to issue and enforce the EEOs, and fail to examine or cite <u>IROAR v. DeBlasio</u>, Supreme Court of New York, County of Richmond, Index No. 85055/21 (September 10, 2021), on the question.[1] Thorough examination of <u>IROAR</u> reveals that the EEOs are without legal authority. Rather than addressing such law, defendants misread Exec. Law §§ 20 and 24 as the source for their authority. (Db 22-23).

While Executive Branch actions may have a general effect on private citizens, the Executive usually may not dictate private citizens' conduct by fiat. Neither businesses nor individuals are Executive Branch employees. While the Mayor may exercise some authority over private citizens, albeit of limited time and scope, in certain narrowly defined circumstances, and for only five days, all legitimate grants of power were swept aside with the EEOs.

The Mayor expressed in EEO 225 that it was promulgated under "the laws of the State of New York and The City of New York, including but not limited to the New York Executive Law, the New York City Charter and the Administrative Code of the City of New York, and **the common law authority to protect the public in the event of an emergency...**" (emphasis added). None such authorizes the Mayor's acts. First, as noted in <u>IROAR</u>, there is no known

---

[1] Inadvertently, the complete Decision and Order was not attached to the Berutti Declaration at Ex. A. Thus, a complete copy is attached as Exhibit N to the Berutti Reply Dec. ("RD"). "VD" is Varga Declaration; "Db" is Defendants' Brief.

2

"common law power ... granting an individual acting in the capacity as the local Executive branch the 'authority' to 'protect the public in the event of an emergency.'" Id. at 3-4.

Further, Exec. Law § 24 limits EEOs to a maximum of 30 days, and only permits EEOs "to protect life and property or to bring the emergency situation under control." Exec. Law § 24 also provides examples of limited permissible five-day *suspension* of certain local laws, regulations, and state laws, and appears to permit the chief executive to issue orders to establish medical care facilities and to provide public services through executive orders. *Nowhere* does the statute permit the Mayor *proactively* to issue unlimited "emergency" regulations, such as the EEOs. Thus, analysis of Exec. Law §§ 20 and 24, amply demonstrates that the Mayor's emergency powers are restricted, and have definitive starting and end points, in contradiction of the EEOs.

Further, the New York City Administrative Code provides the Mayor with no authority to make or enforce such EEOs. More specifically, NYCAC §§ 3-104 and 107 limit the Mayor's power to declare emergencies to instances of public disorder and widespread disobedience of law which threatens civil order and the general welfare of the City, but only for up to five days. The current putative 'crisis' is not "an act of violence or a flagrant and substantial defiance or resistance of a lawful exercise of public authority...", such that the Mayor has no emergency power which permitted promulgation of the EEOs.

Nothing prevents the *City Council*--the elected legislative body of the public--from promulgating emergency rules that otherwise are legally sound, and then for no more than sixty days. NYCAC § 1041. Nowhere is the Mayor granted authority to seize vast powers unto himself, and then impose onerous rules on businesses and the public pursuant to fiat. Any and all such acts are *ultra vires*; they also fit the very definitions of "tyranny" and "despotism," per our nation's Founding Fathers' definitions, regardless of motives:

3

> James Madison, a central architect of the Constitution, rightly observed that if "men were angels, no government would be necessary." Federalist No. 51 (1788). He knew that every official or body would seek to accumulate "all powers, legislative, executive, and judiciary, in the same hands," and that such a concentration would be "the very definition of tyranny." Federalist No. 47 (1788). Thomas Jefferson agreed, labeling such a concentration of power as "precisely the definition of despotic government." Notes on the State of Virginia, Query 13 (1784).

Watson and Burnham, Separation of Powers, A Primer (September 9, 2015), https://fedsoc.org/commentary/fedsoc-blog/separation-of-powers-a-primer. Similarly, the IROAR Court wrote:

> The New York City Charter, like the constitutions governing the actions of the federal and state governments separates governmental powers across three branches of government--the Executive, Legislative, and Judicial …Those individuals subject to the orders issued by an Executive, generally employees of the Executive branch, must obey orders issued by the Executive because those orders represent the will of the executive branch of government which resides in an individual elected by the people.
>
> While the administration of governmental agencies operated by the Executive branch may reach down and directly affect the people on an individual basis, the government, through the Executive, *may* not usually dictate a course of conduct on the people through fiat--citizens, whether small business owners or residents of the City, are not employees of the Executive branch [of] government.

IROAR, *supra*, at 2-3. The Court later continued:

> Unlike either legislation or regulation the use of emergency executive powers by the government eliminates the people's rightful role in government. While the use of an executive order may be permitted, its use is strictly limited. The purported actions taken in Emergency Order 225 seeking to affect the public health and welfare of the people within New York City are opaque. Still Emergency Executive Order 225 issued by the government dictates affirmative steps effectively deputizing private individuals to curtail the freedom of movement and association of their neighbors and patrons or face significant fines. An official record justifying the government's fiat does not exist. Public testimony from public health care scholars and practitioners supporting these steps do not exist. The people's representatives are not on record questioning the decision, conclusions, and guidance of health care scholars and practitioners.

Id. at 8. *See also* Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 589 (1952) (restating the Founding principle of separation of powers even in times of national crisis.")

4

The qualifications of defendants' "expert", Dr. Varma, notwithstanding, an injunction is proper since promulgation of the EEOs smacks of the one-man rule of which Madison and Jefferson warned. Such was plainly the theme of Hon. Lizette Colon, J.S.C., in discussing such qualification in the IROAR Decision and Order (at 13): "The accolades and stellar academic credentials, and a position of authority within the government does not obviate the requirement to follow procedures when either compelling the people to take an action, or suspending the people's ability to act a certain way." [2]

**POINT II: THE LACK OF A RELIGIOUS EXEMPTION IS UNCONSTITUTIONAL.**

Defendants likewise have failed to address the lack of a religious exemption in light of other, secular exemptions provided to athletes and entertainers. Defendants thus have not sufficiently refuted the argument that the failure to include a religious exemption renders the EEOs unconstitutional.

"Government is not free to disregard the First Amendment in times of crisis. At a minimum, that Amendment prohibits government officials from treating religious exercises worse than comparable secular activities, unless they are pursuing a compelling interest and using the least restrictive means available." Roman Cath. Diocese of Brooklyn v. Cuomo, 141 S. Ct. 63, 69 (2020) (Gorsuch, J. concurring). Here, exemptions exist within the EEOs for out-of-town athletes and entertainers, but not for those claiming a First Amendment-protected religious exemption. "At a minimum, that Amendment prohibits government officials from treating religious exercises worse than comparable secular activities, unless they are pursuing a compelling interest and using the least restrictive means available." Id. (Gorsuch, J. concurring) (*citing* Church of Lukumi v. Hialeah, 508 U.S. 520, 546 (1993)). Thus, the EEOs "must satisfy

---

[2] Other than their "takings" claim, the plaintiffs believe that each of their Counts can stand on their own with respect to injunction analysis. However, in light of defendants' lack of authority to issue the EEOs, the plaintiffs assert that a preliminary injunction may also issue on the takings claim, which shall not further be briefed herein.

5

'strict scrutiny,' meaning that they must be 'narrowly tailored' to serve a 'compelling' state interest. Id. at 66.

The EEOs are not narrowly tailored to achieve their object. Forcing individuals to get vaccinated despite religious objections is neither narrowly tailored nor is such coercion a compelling state interest. Further, the EEO's "accommodation" provision is a useless makeweight, as set forth below. Thus, a preliminary injunction should be issued.

**POINT III: THE EEOS MUST FAIL SINCE THE MAYOR HAS NO LEGAL AUTHORITY TO IMPOSE CONDITIONS ON INDIVIDUALS REFUSING EUA SHOTS**

Dr. Varma errantly asserts, "All three vaccines authorized by the FDA in the United States demonstrate high levels of protection against severe illness and death." (VD ¶22). The truth is that on August 23, 2021, the FDA gave full approval to Pfizer/BionTech's "Comirnaty" vaccine for individuals **16 and older.**[3] (RD., Ex.A). The well-known Pfizer vaccine which remains widely available in the USA had the same formulation, but is legally distinguishable, and remains available under EUA authority. (Id., Ex. B, fn.1). Indeed, there is no "biosimilar" vaccine which is interchangeable with Comirnaty, based on the "Purple Book" which lists interchangeable drugs. (Id., Ex. C). Comirnaty is not widely available in the US (and may not be available at all), and Pfizer "does not have additional information on the timing of availability of the Comirnaty-labeled vaccine." (Id., Ex. D). It is judicially noticeable that only other vaccines available in the United States, those of Moderna and Johnson & Johnson, are only authorized for Emergency Use.

Ten days after this action was filed, this Court wrote, in Maniscalco v. New York City Dep't of Educ., No. 21-CV-5055 (BMC), 2021 WL 4344267, at *3 (E.D.N.Y. Sept. 23, 2021) (emphasis added): "Requiring that DOE employees take a dose of ivermectin as a condition of

---

[3] Thus, there still is no approved COVID vaccine for anyone under 16, yet the EEOs apply to 12-15 years olds.

6

employment might qualify as 'a plain, palpable invasion' of such rights, not having any real relation to the public health crisis. However, **mandating a vaccine approved by the FDA** does not." Yet at that time, all or almost all of the available vaccines were authorized under EUOs and were not FDA approved.[4] This Court further wrote in Maniscalco (at *4) that it "cannot reasonably conclude that the defendants' arguments in favor of vaccination were not made in good faith, or that they are irrational. Substantive due process therefore requires the Court to afford deference to defendants' weighing of the competing concerns."

Presumably, defendants made the same argument about three "authorized" vaccines in Maniscalco, and that such assertion went unchallenged. Such position "shocks the conscience," whether Dr. Varma intended to mislead the Court by using the "authorized" word as a sleight-of-hand substitute for "approval", or if he and defendants simply do not know the true facts. Either way, the misimpression made on this Court has not been corrected, as is required by N.Y.R.P.C. 3.1(a)(1). Further, now that the true facts are before this Court, such that defendants cannot claim ignorance of such true facts, they **must** retract any and all fact statements and legal arguments to the contrary.

This Court further concluded in Maniscalco (at *4) that it "cannot reasonably conclude that the defendants' arguments in favor of vaccination were not made in good faith, or that they are irrational. Substantive due process therefore requires the Court to afford deference to defendants' weighing of the competing concerns." In light of the failure of defendants to correct the record in Maniscalco, and their apparently making the same errant arguments herein,

---

[4] Contrary to the available vaccines, Ivermectin is FDA-approved for use in humans. https://www.accessdata.fda.gov/drugsatfda_docs/nda/98/50-742s001_Stromectol.cfm. A recent American Journal of Therapeutics reported that in 15 COVID-related trials, it was found that "ivermectin reduced risk of death compared with no ivermectin" https://journals.lww.com/americantherapeutics/fulltext/2021/08000/ivermectin_for_prevention_and_treatment_of.7.aspx In 2019, Ivermectin was listed in the World Health Organization's Model List of Essential Medicines. https://apps.who.int/iris/bitstream/handle/10665/325771/WHO-MVP-EMP-IAU-2019.06-eng.pdf.

plaintiffs submit that defendants are entitled to no deference whatsoever in weighing the parties' competing concerns. Indeed, any continued such arguments by defendants would amount to bad faith in light of the true facts.

Moreover, the true facts highlight that **any condition placed by any rule of the Mayor on an individual's desire not to be vaccinated with an EUA vaccine violates Section 564 of the Food, Drug, and Cosmetic Act ("FDCA"), 21 USC §360bbb.** FDCA §564 authorizes the FDA to issue EUA's for medical products, such as vaccines, under certain emergency circumstances. FDCA §564(e)(1)(A)(ii) provides "conditions designed to ensure that individuals to whom the product is administered are informed." Among such required conditions are those, in sub-§ (III), providing that **individuals must be apprised "of the option to accept or refuse administration of the product**, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks." (emphasis added). Every person has a statutory right to refuse administration of an EUA 'drug'.

As for the statute's requirement that individuals refusing to take the EUA must be advised "of the consequences," such language can be interpreted two ways, neither of which alters the conclusion that no one may impose coercive consequences for such a refusal. Specifically, "consequences" may refer to the "health consequences" of not getting the EUA drug. Such language would be materially inapplicable to this matter. If such language relates to the "legal consequences," the only statutorily permitted "consequence" to a refusal to take an EUA drug concerns the armed forces, and then only if the President specifically waives the right to refuse based on a declared national security interest. *See* 10 U.S.C. § 1107a

Nobody else is authorized by FDCA §564 to place conditions on an individual's refusal to take an EUA drug or vaccine. Thus, FDCA §564 essentially preempts the EEOs and any other state action to the contrary; it likewise provides no allowance at all for any private action seeking

8

to coerce an individual into taking a EUA vaccine. **Thus, all private citizens must be able to refuse an EUO vaccine without coercion,** *as a matter of law.*[5]

### POINT IV: THE EEOS HAVE AN UNCONSTITUTIONAL DISPARATE IMPACT ON MINORITIES.

Defendants misstate the nature of the harm caused by the EEO to protected classes, asserting that "[a]ll races have equal access to the vaccine and the vaccine requirement is equally applicable to all races." (Db8). Such argument is irrelevant, since the plaintiffs complain that African-Americans and Hispanics are disparately harmed in the impact on their freedom to exercise their constitutional liberty and property interests. The EEOs were knowingly discriminatory in such manner when promulgated, as borne out by the City's own official statistics, and the Mayor's policies targeting greater minority vaccination. Indeed, defendants make no excuses for the blunt force of their race-based policy, asserting that "among those hesitant to get vaccinated, 20.8% said the ability to resume normal activities would motivate them to get vaccinated." (Db5). Before the EEOs, the unvaccinated had the ability to engage in such "normal activities". Now, the most "vaccine hesitant"--namely African-Americans--are being punished. In light of the months of failed efforts to induce minorities to get vaccinated in larger numbers, the intent to punish and coerce unvaccinated minorities disproportionately is obvious. The stated goal is not just to keep minorities out of "recreation activities", but to compel them to discard their choices concerning their own bodily integrity. There is nothing recreational about exercising one's constitutional rights. Indeed, African-Americans remain particularly harmed, as only 40% are fully vaccinated, and 47% have at least one dose. (RD, Ex. G).

**The Supreme Court has recognized that discriminatory purpose can be shown by**

---

[5] Assuming *arguendo* that the Mayor is permitted to impose conditions, the command of "get vaccinated" or "give up your business, jobs, health insurance, benefits, and full enjoyment of society," is not a truly meaningful choice, such that it would defeat the plain statutory charge that individuals may refuse an EUA vaccine.

**proof that the discriminatory impact is the reasonably foreseeable consequence of the challenged action.** Thus, "actions having foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact, forbidden purpose," and **adherence to a challenged action with full knowledge of the predictable effects** is one factor, among others, which may be considered in determining purpose. Columbus Board of Educ. v. Penick, 443 U.S. 449, 464–65 (1979). Review of the "totality of the circumstances" of the *results* of the EEOs as *applied* demonstrates irreparable harm to minorities. *See* Washington v. Davis, 426 U.S. 229, 241 (1976).

Certainly, the Mayor "reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." (Db8) (*quoting* Cong. Rabbin. Coll. of Tartikov v. Vill of Pomona, 915 F. Supp.2d 574, 616 (S.D.N.Y. 2013); Hayden v. County of Nassau, 180 F.3d 42, 50 (2d. Cir.1999)). The discriminatory impact was a reasonably foreseeable and intended consequence of the EEOs. Thus, the burden of proof shifts to defendants, and a likelihood of success on the merits by the plaintiffs has been shown.[6]

## POINT V: DEFENDANTS HAVE FURTHER ENHANCED THE CASE FOR AN INJUNCTION PURSUANT TO THE THIRTEENTH AMENDMENT.

Interestingly, although not mentioned in the EEOs, defendants argue: "Businesses may consider whether they are able to make reasonable accommodations pursuant to Federal, State or local laws for patrons and employees who are unable to be vaccinated."[7] (DB5). Such premise is not discussed in defendants' cursory analysis of the plaintiffs' Thirteenth Amendment claim that

---

[6] Defendants contend, with respect to the Equal Protection arguments raised related to the disparate treatment of restaurants, gyms and some entertainment venues, as compared to other businesses in the City, that the plaintiffs fail to identify sufficient comparators. (Db11). Such argument is specious. The EEO's apply only to restaurants, gyms, and theatres. Every other establishment (including retail and others, which common sense indicates have similar levels of contact) is exempt from such rules. To identify every single comparator of the hundreds would be a wasteful effort. Clearly such comparators exist for such argument, such that the plaintiffs shall not further address same.

[7] Such argument adds yet a further layer of legally baseless fiat rule, where the Mayor is providing 'administrative guidance' for businesses on how to engage in due process analyses when confronted with 'problems' that defendants foresaw, but for which they allowed no general accommodation.

the EEOs result in indentured servitude of businesses, their owners, and employees. Yet it has added a further deep layer to the argument, as the plaintiff restaurants and gyms no longer are 'only' being obligated to check vaccine cards and identifications of every patron and employee, but also must now assess whether patrons or employees should receive an 'exemption' from the EEO based on religious, medical, or other such reason. Thus, the nature of the servitude is akin to deputizing restaurants, gyms, and their employees as quasi-police officers and administrative hearing officers. Nobody has signed up for such responsibilities; but all are coerced to so act under threat of potentially crippling fines.

Such requirements are nothing like pro bono for an attorney, cutting grass on one's own property, or withholding wages for payroll taxes, which constitute "minimal regulation on business." (Db18-19). Further, each of cases cited by the City constitutes a *legislative* enactment, not executive fiat. Selective Draft Law Cases, 245 U.S. 366 (1918) ("the power of Congress to compel military service"); Butler v. Perry, 240 U.S. 328 (1916) (Florida *statute* requiring every able-bodied man within its jurisdiction to work during each year for six ten-hour days on public road within the county of his residence…) (emphasis added); United States v. 30.64 Acres Land, 795 F.2d 796 (9th Cir. 1986) (a state may require attorneys to work pro bono…). The remaining cases cited by the City also concern legislative enactments of legislative bodies, or statutes, or duly promulgated regulations, not executive fiats dictated by one individual. The City also improperly relies upon the comparison of restaurants checking for identification for service of alcohol before serving patrons under 21. There is no legal requirement of restaurants and bars to perform ID checks for proof of age, but rather, such only is suggested.[8] Moreover, the requirement here has an unseemly racial overtone, whereby a disproportionate number of minorities will be advised that they may not enter restaurants and gyms. Based on the foregoing,

---

[8] *See* https://www1.nyc.gov/site/cchr/community/covid-public-places.page.

the Thirteenth Amendment claim is likely to succeed, thus requiring an injunction.

**POINT VI: DEFENDANTS INCORRECTLY APPLY A GENERAL RATIONAL BASIS STANDARD TO FUNDAMENTAL RIGHTS CLAIMS.**

Defendants have failed to address fundamental issues in a meaningful way, and otherwise have misapplied standards with respect to the plaintiffs' constitutional claims.

Initially, defendants seek to apply a "reasonableness" standard to claims of bodily integrity. Even under such construct, which plainly is erroneous, an injunction must be granted, since two of the plaintiffs have been told not to get the vaccine lest they may die, and a third has been advised not to get it as well for medical reasons. There is nothing reasonable about an EEO that would require people to get a vaccine if it may kill them. Instead, as noted in the moving brief, cases have alternatively examined individual cases and applied a sliding scale of standards. For instance, in the oft-cited Jacobson v. Commonwealth of Massachusetts, 197 U.S. 11, 39 (1905), with respect to the plaintiff therein, the Court applied what today would be a rational basis review as to whether the healthy plaintiff was compelled to be vaccinated for smallpox.[9] *See also* Roman Catholic, *supra,* 141 S.Ct. 70 (Gorsuch, J. concurring) (noting that with respect to Jacobson, the Court applied the modern rational basis test). Jacobson also specified that its application was not an "absolute rule that an adult must be vaccinated if it be apparent or can be shown with reasonable certainty that he is not at the time a fit subject of vaccination, or that vaccination, by reason of his then condition, would seriously impair his health, or probably cause his death." Jacobson, *supra,* at 39. Thus, Jacobson expressed that a different standard would apply in such cases. Other cases, such as Riggins v. Nevada, 504 U.S. 127 (1992), discuss bodily integrity in light of intermediate scrutiny, requiring a showing of an "essential" need and the lack

---

[9] Defendants' reliance on Jacobson as the standard for this case is misplaced, since Jacobson involved a legislative enactment (the Cambridge Board of Health), and not executive fiat. Thus, the facts of this matter are distinguishable from Jacobson.

of "reasonable alternatives" and appropriate medical safeguards. Thus, the Courts clearly provide that a 'one size fits all' approach to bodily integrity issues is inappropriate. Whether intrusions can be compelled depends on a mix of circumstances that a rational basis analysis will not always satisfy.

Indeed, the Second Circuit has applied a case-by-case approach to fundamental rights analysis, contrary to the arguments of defendants. *See* Crawford v. Cushman, 531 F.2d 1114, 1124-5 (2d 1976) (each pregnant Marine must be viewed individually for combat readiness; "irrebuttable presumption"--*i.e.*, a general legislative finding supposedly supporting a general restriction--must give way to **"an individualized determination"** for each woman affected) (emphasis added).[10] *See also* Tribe, Structural Due Process, 10 Harv.C.R.C.L.L.Rev. 269 (1975), referenced in Women's Health Servs., Inc. v. Maher, 514 F. Supp. 265, 272, n.5 (D. Conn. 1981). *Cf.* Alma Soc. Inc. v. Mellon, 601 F.2d 1225, 1233, 1235 (2d Cir. 1979) (alternatively applying intermediate scrutiny in a case of an adult adoptee seeking to unseal parental records, noting: "we must ensure that the individual has the opportunity to rebut any overbroad presumptions that seriously affect the fairness of the scheme."),

Thus, if the essence of curtailing a plaintiff's fundamental individual rights is to force her to take a vaccine that will kill her, or place undue jeopardy on someone in her category, or compel a religious-belief violation, then a generalized response about general categories, and general studies about how "generally good" vaccines are, is not sufficient. Such is especially true where, as here, (a) deaths from the pandemic are drastically reduced; (b) the medical literature is uncertain, most particularly with long-term effects of the vaccines, and they remain experimental; (c) the specific plaintiffs pose no or nominal risk to others--as do most unvaccinated individuals, given the small positive test rate identified in the moving papers; and

(d) there are specific medical diagnoses and risks for the specific plaintiffs, whose individualized fundamental rights need to be addressed.

**POINT VII. ADDITIONAL FACTORS REVEAL THE EEOS TO BE IRRATIONAL.**

The EEOs take action against what defendants see as being a politically undesirable class --the unvaccinated ("UV"). The EEOs 'nobly' are for the UVs' own protection from themselves, since per the City's own statistics, 98% of those purportedly being hospitalized or dying from the virus in the City are UVs. Classification based on political popularity and protecting oneself against oneself is irrational. U. S. Dep't of Agric. v. Moreno, 413 U.S. 528, 534 (1973).

The following additional points also reveal the EEOs' irrationality: (1) to be "fully vaccinated," one must be two weeks past the second shot (RD. Ex. E), yet the EEOs allow single Pfizer/Moderna shots to count, which is irrational; (2) COVID deaths and hospitalizations continue on a downward trend and are largely attributed to the unvaccinated; even so, the determination of what constitutes a "Possible Case" includes that a "Person died and their cause of death on the death certificate is COVID-19 or similar, but a positive molecular test is not on record." Thus, those counted among COVID deaths may not even COVID-related (RD, Ex. F); (3) official CDC statistics reveal 8,390 reported vaccine-related deaths, among other growing adverse event categories (RD, Ex. H); (4) A recent Cleveland Clinic study found natural immunity to provide greater protection than vaccines (RD., Ex. I); (5) VR, fn. 7, regarding vaccine effectiveness predated the Delta variant, and has numerous qualifiers (RD, Ex. I, p.4); (6) VR, fn. 10, used to justify compelling the naturally immune to get vaccinated, notes that "Few real-world epidemiologic studies exist to support..." the conclusion (RD, Ex. K, p. 2); (7) VR, fn.11, is an antibody study limited to 700 residents of Kentucky (RD L); and (8) the charts

---

[10] For purely economic rights, general irrebuttable presumptions or the like are allowed. Sakol v. C.I.R., 574 F.2d 694 (1978), and military matters are not treated differently. Mack v. Rumsfeld, 784 F.2d 438 (2d Cir. 1986).

used in the VR, p. 9, only show a trend from July 4, 2021. Charts with a longer timeline much more clearly show how the virus is ebbing including among the unvaccinated. (RD, Ex. M).

## CONCLUSION

Based on the foregoing, there is ample evidence to support that the plaintiffs have a likelihood of success on the merits, that they will be irreparably harmed if an injunction is not granted, and that the balance of equities favors their case. Moreover, the public interest supports the plaintiffs. Thus, a preliminary injunction should be entered in the plaintiffs' favor.

Respectfully submitted,

**WEINER LAW GROUP LLP**
Attorneys for Plaintiffs

By: *Ronald A. Berutti*
     Ronald A. Berutti
Dated: October 8, 2021      A Member of the Firm