UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------- X
SHAW-NAE DIXON, THOMAS              :
CASATELLI, JEANETTE RIVERA,         :
NATALIA YAKUBOVA, CHRIS KING,       :          **MEMORANDUM DECISION**
ALISON MARCHESE on behalf of AM, JM, :         **AND ORDER**
and MMV (her minor children), WILLIAM :
MORRIS, GEORGE KABBEZ, MARY         :          21-cv-5090 (BMC)
JOSEPHINE GENEROSO, SHAW-NAE'S      :
HOUSE, LLC, SALTY DOG              :
RESTAURANT, LTD, PER TAVERN         :
CORP. d/b/a THE KETTLE BLACK,       :
CARGOSTORK PARTIES, INC. d/b/a DO   :
ME A FAVOR, and INDEPENDENT         :
RESTAURANT OWNERS ASSOCIATION       :
RESCUE, INC.,                       :
                                    :
                    Plaintiffs,     :
                                    :
        - against -                 :
                                    :
BILL DE BLASIO, Mayor of New York   :
City, in his official capacity, and THE CITY :
OF NEW YORK,                        :
                                    :
                    Defendants.     :
--------------------------------------------------------- X

**COGAN**, District Judge.

Plaintiffs seek a preliminary injunction barring the enforcement of three New York City

Emergency Executive Orders ("EEOs 225, 226, and 228") issued by the Mayor of the City of

New York.  With limited exception, the EEOs require "covered entities" to prevent individuals

who have not received a COVID-19 vaccine from remaining in certain indoor facilities for

prolonged periods of time.  Plaintiffs claim this violates their Thirteenth and Fourteenth

Amendment rights, as well as constituting an uncompensated taking and a violation of New York

State law.

Plaintiffs' requested preliminary injunction is denied because they are unlikely to succeed on the merits.

## BACKGROUND

### I.   Factual Background

The novel coronavirus, SARS-CoV-2, and its associated disease, COVID-19, need little introduction.  The virus has infected approximately 1.1 million people and killed over 34,000 in New York City alone.[1]  At the height of the pandemic in New York City, over 18,000 people were hospitalized, and 800 people died per day.[2]

COVID-19 transmission increases when people are in close contact because the virus spreads through contact, respiratory droplets, and aerosols.[3]  Airborne transmission of the virus, in which the infection spreads through exposure to small droplets and particles that can remain suspended in the air for hours, is more likely to occur in enclosed spaces and with prolonged exposure.

In mid-December 2020, the FDA issued an emergency use authorization for two COVID-19 vaccines developed by Pfizer and Moderna.[4]  Then, on March 1, 2021, Johnson & Johnson also released a third COVID-19 vaccine.[5]  At present, approximately 56% of the United States is

---

[1] Eleanor Lutz et al., Tracking Coronavirus in New York: Latest Map and Case Count, N.Y. TIMES (Oct. 5, 2021), https://www.nytimes.com/interactive/2021/us/new-york-covid-cases.html.

[2] Governor Cuomo Announces Lowest Number of Deaths and Hospitalizations since COVID-19 Pandemic Began, Ny.Gov (June 5, 2020), https://www.governor.ny.gov/news/governor-cuomo-announces-lowest-number-deaths-and-hospitalizations-covid-19-pandemic-began.

[3] Scientific Brief: SARS-CoV-2 and Potential Airborne Transmission, Ctrs. Disease Control & Prevention (updated May 7, 2021), https://www.cdc.gov/coronavirus/2019-ncov/more/scientific-brief-sars-cov-2.html.

[4] Chris Wilson, The U.S. COVID-19 Vaccine Rollout Is Getting Faster. But Is It Enough, TIME (Feb. 12, 2021), https://time.com/5938128/covid-vaccine-rollout-biden/.

[5] Ivan Pereira, US begins rollout of Johnson & Johnson coronavirus vaccine, ABC News (Mar. 1, 2021), https://abcnews.go.com/Health/us-begins-rollout-johnson-johnson-coronavirus-vaccine/story?id=76167161.

fully vaccinated against the virus.[6]  In New York City, the vaccination rate among residents is higher – 64%.[7]

However, the vaccines are not a complete protection against the disease.[8]  Additionally, with the large number of unvaccinated individuals remaining, there is a risk that any one hospital system could be placed under stress by a surge in cases.[9]  Approximately 54% of hospitals in the United States are currently under high or extreme stress due to an influx of COVID-19 hospitalizations.[10]  This risk is compounded by the rise of COVID-19's Delta variant, which has been found to be the cause of a recent increase in cases.[11]  Among unvaccinated individuals, early data also suggests that the Delta variant is more likely to cause severe infections.[12]

In response to the rise in Delta variant cases, between August 16, 2021, and August 25, 2021, the Mayor of New York City signed EEOs 225, 226, and 228.  These EEOs state that "covered entities" "shall not permit a patron, full- or part-time employee, intern, volunteer, or contractor to enter a covered premise without displaying proof of vaccination and identification bearing the same identifying information as the proof of vaccination."  Id. at § 4(b).  The EEOs

---

[6] Eleanor Lutz et al., Tracking Coronavirus in New York: Latest Map and Case Count, N.Y. TIMES (Oct. 4, 2021), https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html.

[7] COVID-19: Data, Vaccines, NYC Health (Oct. 5, 2021), https://www1.nyc.gov/site/doh/covid/covid-19-data-vaccines.page.

[8] Possibility of COVID-19 Illness after Vaccination, Centers for Disease Control and Prevention, (last updated Sept. 7, 2021), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/why-measure-effectiveness/breakthrough-cases.html.

[9] Where are Hospitals Overwhelmed by COVID-19 Patients? Look Up Your State, NPR (Oct. 4, 2021), https://www.npr.org/sections/health-shots/2020/12/09/944379919/new-data-reveal-which-hospitals-are-dangerously-full-is-yours.

[10] Id.

[11] COVID-19: The Delta Variant, Centers for Disease Control and Prevention, (last updated Aug. 26, 2021), https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html.

[12] Id.

define "covered premises" as "Indoor Entertainment and Recreational Settings,"[13] "Indoor Food Services,"[14] and "Indoor Gyms and Fitness Settings."[15]  "[H]ouses of worship or locations in a residential or office building the use of which is limited to residents, owners, or tenants" are not "covered premises."  Id. at § 4(f)(3)(iv).  Relatedly, a "covered entity" "means any entity that operates one or more covered premises."  Id. at § 4(f)(2).

EEO 228 § 4(c) outlines three exceptions to the § 4(b) provision.  First, individuals lacking proof of vaccination can enter covered premises for a quick and limited purpose (for example, using the restroom or picking up an order).  Id. at § 4(c)(1).  Second, an unvaccinated nonresident and nonregular performing artist and nonresident individuals accompanying that artist can enter otherwise covered premises for prolonged periods to perform in the premises.  Id. at § 4(c)(2).  Third, a nonresident professional sports team and nonresident individuals accompanying that team can enter an otherwise overed premises to engage in athletic competition.  Id. at § 4(c)(3).  However, even in these situations, individuals who lack proof of

---

[13] The EEOs define "Indoor Entertainment and Recreational Settings," as "including indoor portions of the following locations, regardless of the activity at such locations: movie theaters, music or concert venues, adult entertainment, casinos, botanical gardens, commercial event and party venues, museums, aquariums, zoos, professional sports arenas and indoor stadiums, convention centers and exhibition halls, performing arts theaters, bowling alleys, arcades, indoor play areas, pool and billiard halls, and other recreational game centers[.]"  EEO 228 § 4(f)(3)(i).

[14] The EEOs define "Indoor Food Services," as "including indoor portions of food service establishments offering food and drink, including all indoor dining areas of food service establishments that receive letter grades as described in section 81.51 of the Health Code; businesses operating indoor seating areas of food courts; catering food service establishments that provide food indoors on its premises; and any indoor portions of an establishment that is regulated by the New York State Department of Agriculture and Markets offering food for on-premises indoor consumption. The requirements of this Order shall not apply to any establishment offering food or drink exclusively for off-premises or outdoor consumption, or to a food service establishment providing only charitable food services, such as soup kitchens[.]" EEO 228 § 4(f)(3)(ii).

[15] The EEOs define "Indoor Gyms and Fitness Settings," as "including indoor portions of standalone and hotel gyms and fitness centers, gyms and fitness centers in higher education institutions, yoga/Pilates/barre/dance studios, boxing/kickboxing gyms, fitness boot camps, indoor pools, CrossFit or other plyometric boxes, and other facilities used for conducting group fitness classes."  EEO 228 § 4(f)(3)(iii).

vaccination must still either maintain a six-foot distance between themselves and others or always wear a face mask.  Id. at § 4(c).

Under the EEOs, any person or entity that violates these provisions is subject to a fine, penalty, and forfeiture of at least $ 1,000.  Id. at § 4(j)(1).  If that individual or entity violates the EEOs' provisions a second time within a twelve-month period, the minimum fine is $ 2,000.  Id. For each violation that occurs within a twelve-month period after the second violation, the fine is at least $ 5,000.  Id.  Although almost all the EEOs' requirements became effective immediately, this penalty provision only took effect on September 13, 2021.  Id. at § 6.

## II.    **Procedural Background**

Plaintiffs are individuals, businesses, and a business association.  Together, they assert a plethora of reasons why the City should be enjoined from enforcing the EEOs.  First, they maintain that the EEOs violate their rights as stated in the Fourteenth Amendment's Equal Protection clause.  This is because plaintiffs believe the EEOs were promulgated by the Mayor with the specific intent to harm the liberty interest of African Americans and Hispanics.  Second, plaintiffs contend the EEOs violate their Fourteenth Amendment substantive due process rights and the First Amendment because the EEOs infringe on the following liberty interests: freedom of religion, freedom of bodily health and integrity, freedom of association, freedom to pursue a private professional career of one's choice, and freedom to raise one's children.  Third, plaintiffs argue that the EEOs have unconstitutionally impressed them into executing the Mayor's edicts without just compensation, thus violating the Thirteenth Amendment.  Fourth, plaintiffs assert that the EEOs are also a taking that will cause irreparable damage to their businesses without just compensation.  Fifth, plaintiffs reason that the Mayor lacks the legal authority under New York

law to issue and enforce these EEOs.  Finally, plaintiffs argue that the EEOs violate the

Fourteenth Amendment's Privileges and Immunities Clause.

## DISCUSSION

The elected chief executive of New York City has the authority to act decisively to

ensure the City's safety during a public health crisis.  Thus, although plaintiffs' constitutional

claims demonstrate *de facto* the potential for irreparable harm, the underlying merits of

plaintiffs' claims and the equities at stake do not meet the high bar required for this Court to

issue a preliminary injunction.  See Winter v. Nat. Res. Def. Couns., Inc., 555 U.S. 7, 24 (2008)

("In exercising their sound discretion, courts of equity should pay particular regard for the public

consequences in employing the extraordinary remedy of injunction." (quoting Weinberger v.

Romero-Barcelo, 456 U.S. 305, 312 (1982))).

In this Circuit, "[a] party seeking a preliminary injunction must generally show a

likelihood of success on the merits, a likelihood of irreparable harm in the absence of preliminary

relief, that the balance of equities tips in the party's favor, and that an injunction is in the public

interest."  Am. C.L. Union v. Clapper, 804 F.3d 617, 622 (2d Cir. 2015) (internal quotes and

citations omitted).  "In the Second Circuit, it is well-settled that an alleged constitutional

violation constitutes irreparable harm."  Ferreyra v. Decker, 456 F. Supp. 3d 538, 549 (S.D.N.Y.

2020); see also Statharos v. N.Y.C. Taxi & Limousine Comm'n, 198 F.3d 317, 322 (2d Cir.

1999).  Because plaintiffs allege that several of their constitutional rights have been violated, "no

further showing of irreparable injury is necessary."  Mitchell v. Cuomo, 748 F.2d 804, 806 (2d

Cir. 1984).  Therefore, this analysis focuses primarily on each claim's likelihood of success on

the merits.

## I.   **Equal Protection**

Plaintiffs' equal protection claim fails because they have not shown that the EEOs target

a protected class, are the result of animus, or are not rationally related to a legitimate government

interest.  Unless a statute or state action provokes "strict judicial scrutiny because it interferes

with a fundamental right or discriminates against a suspect class, it will ordinarily survive an

equal protection attack so long as the challenged classification is rationally related to a legitimate

governmental purpose." Kadrmas v. Dickinson Pub. Sch., 487 U.S. 450, 457–58 (1988) (internal

quotes and citations omitted).

To demonstrate an equal protection violation, plaintiffs must show that a government

actor intentionally discriminated against them based on their race, national origin, or gender.

Such intentional discrimination can be demonstrated in several ways.  First, the law or policy can

be discriminatory on its face if it expressly classifies persons because of race, national origin, or

gender.  See Hayden v. Cnty. of Nassau, 180 F.3d 42, 48 (2d Cir. 1999).  In addition, a law

which is facially neutral violates equal protection if it is applied in a discriminatory fashion.  Id.

(citing Yick Wo v. Hopkins, 118 U.S. 356, 373–74 (1886)).  Lastly, a facially neutral statute

violates equal protection if it is motivated by discriminatory animus and its application results in

a discriminatory effect.  See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S.

252, 264–65 (1977).

Plaintiffs contend that they belong to two protected classes – African Americans and

Hispanics.  They then argue that because of the lower vaccination rates among African American

New York residents, the EEOs will disproportionally prevent this class of New Yorkers

(approximately 59% of African Americans) from entering "covered entities."  From this,

plaintiffs believe they are entitled to have this Court review these EEOs under the strict scrutiny standard.  This is not so.

Plaintiffs' position is unable to withstand the simple observation that all unvaccinated individuals, regardless of race, religion, or national origin, are treated the same under these EEOs.  Thus, the EEOs are both facially neutral and not applied in a discriminatory fashion against the claimed class.  Any African American or Hispanic individual has a right to access a "covered premise," if that individual has documents showing they are vaccinated.  The same is true for any other individual in New York City.

To the extent that the EEOs disproportionately affect the African American or Hispanic communities, this disparity can be remedied by those individuals getting vaccinated.  Federal, state, and local officials have worked to make vaccines ubiquitously available.[16]  In fact, plaintiffs acknowledge that "the Mayor and City have been directing massive resources toward convincing minorities including Hispanics/Latinos, but mainly African-Americans to get vaccinated.  At least $ 125 million went into such a campaign."

Plaintiffs claim this fact shows that the Mayor issued the EEOs with the specific intent of forcing these communities to get the vaccine through onerous restrictions on their movement. I don't see it that way.  Rather, this fact indicates that the Mayor has made an effort to ensure these communities would have access to the vaccine and not be targeted by the EEOs he is now issuing.

---

[16] See Sharon LaFraniere et al., Biden says there will be enough vaccine available for all adults by the end of May, as Johnson & Johnson makes a deal to boost supply, N.Y. TIMES (March 2, 2021), https://www.nytimes.com/live/2021/03/02/world/covid-19-coronavirus; Dan Krauth, $125 million spent on NYC COVID ad campaign, ABC 7 (July 30, 2021), https://abc7ny.com/delta-variant-covid-nyc-new-york-city-vaccines-campaign/10919669/.

Even if there were a specific intent to increase vaccination rates among that portion of the population – despite the fact that the EEOs apply to all groups equally – that specific intent would not be "animus."  A plaintiff demonstrates animus when a law is  "divorced from any factual context from which we could discern a relationship to legitimate state interests," and "its sheer breadth [is] so discontinuous with the reasons offered for it" that the initiative seems "inexplicable by anything but animus."  Trump v. Hawaii, 138 S. Ct. 2392, 2420 (2018) (quoting Romer v. Evans, 517 U. S. 620, 632, 635 (1996)).

That is not the case here.  The plaintiffs point to no evidence or statements indicating that the Mayor passed these EEOs with the goal of barring minority communities from "covered premises."  Rather, the statements they provide only suggest that the mayor sought to distinguish between vaccinated and unvaccinated individuals.  Thus, unless the EEOs overly burden a suspect class or impinge upon a fundamental right, they are subject to rational basis review.  See Heller v. Doe by Doe, 509 U.S 312, 320 (1993).

The City has provided several such rational justifications for EEOs 225, 226, and 228.  These include: the rise of the COVID-19 Delta variant, the potential for the disease to overwhelm healthcare infrastructure, and the increased prevalence of breakout cases.  This Court has also recognized the validity of substantial state action given the severity of this crisis.  See, e.g., Plaza Motors of Brooklyn, Inc. v. Cuomo, No. 20-cv-4851, 2021 WL 222121, slip op. at *1 (E.D.N.Y. Jan. 22, 2021).  Thus, to prevail on their Equal Protection claim, plaintiffs must show there are specific provisions in the EEOs that fail to be rationally related to the difference in treatment between vaccinated and unvaccinated individuals.  See Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000); see also Progressive Credit Union v. City of New York, 889 F.3d 40, 49 (2d Cir. 2018).  They do not do this.

In their reply brief and at oral argument, plaintiffs raised two novel rational basis challenges to the EEOs. First, they assert that the EEOs do not have a rational relationship to a legitimate state objective because EEO 228 § 4(c)(2) and (3) exempt unvaccinated, nonresident and nonregular performing artists and professional sports teams from the EEOs' requirements. Next, they claim the City's additional guidance on the EEOs grants "covered entities" impermissibly broad discretion to unilaterally make "accommodations," i.e. exceptions, for violations of the orders.

EEO 228 § 4(c)(2) and (3) are both far narrower than plaintiffs assert. Specifically, nonresident and nonregular performing artists and professional sports teams are *only* exempt from the EEOs if they are entering a "covered premises" for the purpose of performance or competition. Even then, these individuals are still required to either maintain six feet of distance from others or wear a mask. If those same athletes or artists want to go to a "covered entity" in a non-professional capacity, the EEOs are clear that they must show proof of vaccination just like everyone else.

These tailored exceptions are rationally related to allowing this small group of individuals to pursue their professions while still limiting their ability to spread or contract COVID. By contrast, it is unavoidable that the average unvaccinated employee or patron of a "covered premise" would encounter a significantly larger portion of the public and, therefore, is far more likely to contract and spread the disease.[17]

---

[17] At oral argument, the City also adopted the position that the economic benefits associated with having high profile athletes and artists come to New York was a rational basis for providing them with a narrow exemption to the EEO. This Court rejects that reasoning. Giving someone an exemption because they are more likely to generate economic activity has no rational relationship to particularly stringent regulations designed to protect the City's health amid a global pandemic.

Separately, plaintiffs also misinterpret the City's additional guidance on the EEOs.  On the "Key to NYC Frequently Asked Questions" web page, the City states:

> Each Key to NYC business should consider appropriate reasonable accommodations, keeping in mind the purposes behind this policy and public health. For additional information, call the Small Business Services hotline at 888-SBS-4-NYC or visit CCHR's website and read CCHR's fact sheets.[18]

Plaintiffs take this one statement to mean that every employer and employee in a "covered premises" must now determine, without guidance, whether an exemption from the EEOs is appropriate under federal, state, and local law.

However, if one follows the provided links[19] the resulting documents give employers, employees, and patrons detailed instructions on how to ensure the EEOs are equitably applied and are not used as an excuse to violate otherwise applicable anti-discrimination laws.  These instructions are clear that no accommodation should violate the EEOs' restrictions.  Rather, they stress that the same type of framework that applies in other anti-discrimination contexts, such as a dialogue between an employer and a disabled employee about reasonable accommodations, still applies in the context of complying with the EEOs.  For example, these documents provide that unvaccinated restaurant patrons should be offered the ability to order takeout and unvaccinated workers might be offered the ability to work outside, take a leave of absence, or work remotely when feasible.

---

[18] Kapil Longani et al., Key to NYC Frequently Asked Questions, NYC COUNSEL TO THE MAYOR (last updated: Oct. 4, 2021), https://www1.nyc.gov/assets/counseltothemayor/downloads/Key-to-NYC-FAQ.pdf.

[19] Guidance for Customers and Employees on Equitable Implementation of Key to NYC, NYC COMMISSION ON HUMAN RIGHTS (last updated: Aug. 17, 2021), https://www1.nyc.gov/assets/cchr/downloads/pdf/materials/KeyToNYC_FactSheet-CustomerEmployee.pdf; Guidance for Businesses on Equitable Implementation of Key to NYC, NYC COMMISSION ON HUMAN RIGHTS (last updated: Aug. 17, 2021), https://www1.nyc.gov/assets/cchr/downloads/pdf/materials/KeyToNYC_FactSheet-Business.pdf.

Consequently, the EEOs are rationally related to the City's reasonable public health objectives – namely, suppressing the number of active and severe COVID cases by limiting unvaccinated individuals' ability to spread or contract the disease.  See Columbus Ale House, Inc. v. Cuomo, 495 F. Supp. 3d 88, 92–93 (E.D.N.Y. 2020) ("When elected officials 'undertake [] to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad.'" (quoting S. Bay United Pentecostal Church v. Newsom, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring)).

## II.   Plaintiffs' First Amendment and Substantive Due Process Claims

"Substantive due process rights safeguard persons against the government's exercise of power without any reasonable justification in the service of a legitimate governmental objective."  Southerland v. City of New York, 680 F.3d 127, 151 (2d Cir. 2012) (internal quotes and citations omitted).  To analyze a substantive due process claim, courts perform a two-step analysis.  Hurd v. Fredenburgh, 984 F.3d 1075, 1087 (2d Cir. 2021).  "The first step . . . is to identify the constitutional right at stake."  Kaluczky v. City of White Plains, 57 F.3d 202, 211 (2d Cir. 1995).  Next, the plaintiffs "must demonstrate that the state action was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."  Southerland, 680 F.3d at 151.

Not all rights are entitled to protection.  Only rights that are fundamental or implicit in the concept of ordered liberty are accorded protection as a matter of substantive due process.  See generally Washington v. Glucksberg, 521 U.S. 702, 720–21 (1997); Hurd, 984 F.3d at 1088; Southerland, 680 F.3d at 152 ("The interference with the plaintiff's protected right must be so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection." (internal quotes and citations omitted)).

12

Plaintiffs bring three substantive due process claims and two First Amendment claims: (1) freedom of religion, (2) freedom of bodily health and integrity, (3) freedom of association, (4) freedom to pursue a private professional career of one's choice, and (5) freedom to raise one's children.  For the reasons discussed below, none warrant enjoining the EEOs enforcement.

### A.  Freedom of Religion

The Free Exercise Clause provides two major protections: freedom to believe and freedom to act in accordance with one's beliefs.  Cantwell v. Conn., 310 U.S. 296, 303–04 (1940).  Although the right to believe freely is "absolute" – the government may not dictate what citizens think – the right to act is qualified by a duty to comply with the law.  See Emp't Div., Dep't of Human Res. of Or. v. Smith, 485 U.S. 660, 670 n.13 (1988); Reynolds v. United States, 98 U.S. 145, 166–67 (1878).  The Free Exercise Clause protects the performance of acts such as assembling for worship, but it "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)."  Cent. Rabbinical Cong. of U.S. & Can. v. N.Y.C. Dep't of Health & Mental Hygiene, 763 F.3d 183, 193 (2d Cir. 2014).

Here, EEOs 225, 226, and 228 are facially neutral because they are not directed against a specific religious practice and there is no evidence of animus.  See generally Trump v. Hawaii, 138 S. Ct. 2392 (2018).  Additionally, the EEOs do not expressly carve out a category for religious conduct and subject that category to more severe restrictions than any other.  Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 546–47 (1993).  Rather, any individual of any religion can have the restrictions imposed by the EEOs lifted by obtaining a widely available vaccine.  Thus, the EEOs simply do not create a special category of harsher

treatment for religious conduct alone, either by their terms or operations.  See W.D. v. Rockland

Cnty., 521 F. Supp. 3d 358, 400 (S.D.N.Y. Feb. 22, 2021).

The Second Circuit addressed a similar situation in Phillips v. City of New York, 775

F.3d 538 (2d Cir. 2015).  There, the plaintiffs argued that a state regulation permitting school

officials to temporarily exclude students who are exempted from a vaccination requirement

during an outbreak of a vaccine-preventable disease was an unconstitutional burden on those

students' religion.  In response to this claim, the Second Circuit observed:

> [T]he Supreme Court has stated in persuasive dictum . . . that a parent "cannot
> claim freedom from compulsory vaccination for the child more than for himself
> on religious grounds.  The right to practice religion freely does not include liberty
> to expose the community or the child to communicable disease or the latter to ill
> health or death."

Id. (quoting Prince v. Massachusetts, 321 U.S. 158, 166–67 (1944)).  The Second Circuit then

found:

> New York could constitutionally require that all children be vaccinated in order to
> attend public school.  New York law goes beyond what the Constitution requires
> by allowing an exemption for parents with genuine and sincere religious beliefs.
> Because the State could bar [plaintiffs'] children from school altogether, *a
> fortiori*, the State's more limited exclusion during an outbreak of a vaccine-
> preventable disease is clearly constitutional.

Id.

This reasoning applies here with equal force.  The EEOs are constitutional because they

do not mandate vaccination.  They merely place reasonable restrictions on those who choose not

to get vaccinated, given the current dynamics of the global pandemic.  Additionally, as discussed

above, these regulations apply to all unvaccinated individuals and are rationally related to the

goal of reducing COVID-19's infection rate.

**B. Freedom of Bodily Health and Integrity**

Plaintiffs also contend these EEOs amount to forced vaccination and thus pose a risk to their health and safety in violation of their fundamental rights. Precedent states otherwise.

Both the Supreme Court and the Second Circuit have expressly rejected the idea of a fundamental right to refuse vaccination. In Jacobson v. Massachusetts, 197 U.S. 11, 26–27 (1905), the Supreme Court upheld a state law allowing cities and towns to implement vaccine mandates in order to contain smallpox outbreaks. In so holding, the Court rejected an argument that liberty interests under the Fourteenth Amendment inevitably prevail in these circumstances. Specifically, the Court did not accept

> that the power of the public to guard itself against imminent danger depends in every case involving the control of one's body upon [an individual's] willingness to submit to reasonable regulations established by the constituted authorities, under the sanction of the state, for the purpose of protecting the public collectively against such danger.

Id. at 29–30.

Since Jacobson, courts have rejected the idea of a fundamental right to refuse vaccination. See, e.g., Klaassen v. Trustees of Ind. Univ., 7 F.4th 592, 593 (7th Cir. 2021) (rejecting a substantive due process challenge to a public university's vaccine mandate). The Second Circuit is in accord. Phillips, 775 F.3d at 542; see Caviezel v. Great Neck Pub. Sch., 500 F. App'x 16, 19 (2d Cir. 2012) (summary order) (rejecting another substantive due process challenge to a school's vaccine mandate for students).

Because the right to refuse vaccination is not a fundamental right, Jacobson "essentially applied rational basis review" – which is "exactly what the Court does today." Roman Cath. Diocese of Brooklyn v. Cuomo, 141 S. Ct. 63, 70 (2020) (Gorsuch, J., concurring).

"Jacobson . . . is still good law, and is the most on-point authority for a due process challenge to emergency measures during a public health crisis." Columbus Ale House, 495 F. Supp. 3d at 92. "Under Jacobson, the state may curtail constitutional rights in response to a society-threatening epidemic so long as the measures have at least some 'real or substantial relation' to the public health crisis and are not 'beyond all question, a plain, palpable invasion of rights secured by the fundamental law.'" Id. at 92 (quoting Jacobson, 197 U.S. at 38).

This case is even easier than Jacobson because the City "does not require every adult member of the public to be vaccinated." Klaassen, 7 F.4th at 593. Instead, vaccination is merely required for those who want to obtain or retain access to certain "covered premises." Id. Thus, these EEOs are not forcing New Yorkers to get vaccinated. They are merely placing restrictions on those who choose not to.

These restrictions are not arbitrary. They follow a set of lawful quarantines put in place by the Governor and the Mayor during a public health crisis. Due to the widely recognized individual dangers of contracting COVID-19 and being unvaccinated, as well as the public health risks tied to overwhelming the hospital system, the EEOs are rationally related to a legitimate City interest – restricting unvaccinated individuals' access to certain public locations where the probability of contracting or transmitting COVID-19 is high.

### C.  Freedom of Association

Plaintiffs also argue that the EEOs violate their freedom of association rights because they want to stand in solidarity with others who are refusing to get vaccinated. Plaintiffs again seek heightened scrutiny for this right and cite to Roberts v. U.S. Jaycees, 468 U.S. 609, 622 (1984), for the proposition that "[a]ccording protection to collective effort on behalf of shared goals is especially important in preserving political and cultural diversity and shielding dissident

expression from suppression by the majority."  In raising the principles outlined in <u>Roberts</u> here, plaintiffs equate apples with bowling balls.

<u>Roberts</u> held that the Minnesota Human Rights Act could require a nonprofit organization, originally established to assist young men, to accept women.  The issue here is not one of an organization choosing specific members nor being required to admit others.  Rather, it is whether any assortment of unvaccinated individuals may be permitted to enter certain indoor public spaces where transmission of a global-pandemic-causing disease is more likely.

In fact, the principles outlined by <u>Roberts</u> militate against plaintiffs' position.  The Supreme Court has long recognized that, "the right to associate for expressive purposes is not . . . absolute."  468 U.S. at 623.  The EEOs here do not restrict plaintiffs' activity to suppress their speech, nor do they distinguish between prohibited and permitted activity on the basis of viewpoint.  Moreover, plaintiffs have not shown that the EEOs will be "applied . . . for the purpose of hampering [their] ability to express [their] views."  <u>Id</u>. at 624.

Nothing in the EEOs requires individuals to get the vaccine or limits unvaccinated individuals' ability to associate with vaccinated or unvaccinated individuals.  What the EEOs do temporarily limit, based on public health concerns, is unvaccinated individuals' ability to enter certain indoor businesses and recreational facilities.  "That goal, which is unrelated to the suppression of expression, plainly serves compelling state interests of the highest order" – restricting the spread of a disease which has the potential to overwhelm the healthcare system.  <u>Id</u>. at 624.

Separately, none of the narrow, "highly personal" liberty interests arising from the fundamental right to free association outlined in <u>Roberts</u> are adversely impacted by the EEOs' requirements.  "The personal affiliations that exemplify these considerations . . . are those that

attend the creation and sustenance of a family – marriage, childbirth, the raising and education of

children, and cohabitation."  Id. at 619.  Roberts thus holds that:

> an association lacking these qualities – such as a large business enterprise – seems
> remote from the concerns giving rise to this constitutional protection.
> Accordingly, the Constitution undoubtedly imposes constraints on the State's
> power to control the selection of one's spouse that would not apply to regulations
> affecting the choice of one's fellow employees.

Id. at 620.  Individuals who refuse the vaccine can still associate with each other as well as

remain members of social clubs or other groups.  In fact, the EEOs explicitly exclude from the

definition of "covered premises" areas where potentially sacred and protected activity would

occur.  This exclusion covers "houses of worship or locations in a residential or office building

the use of which is limited to residents, owners, or tenants."  EEO 228 § 4(f)(3)(iv).

### D.  The Right to Pursue a Chosen Occupation

Plaintiffs correctly observe that the Supreme Court "has indicated that the liberty

component of the Fourteenth Amendment's Due Process Clause includes some generalized due

process right to choose one's field of private employment."  Conn v. Gabbert, 526 U.S. 286,

291–92 (1999).  However, this right is "subject to reasonable government regulation."  Id. at 292.

To "rise to the level of a violation of the Fourteenth Amendment's liberty right to choose and

follow one's calling," the government regulation must result in more than a "brief interruption."

Id.  "[T]he Supreme Court, [the Second] Circuit, and the other Circuits addressing the issue have

all indicated that the right of occupational choice is afforded Due Process protection only when

[ ] plaintiff[s] are 'completely prohibited' from engaging in [their] chosen profession."  Hu v.

City of New York, 927 F.3d 81, 102 (2d Cir. 2019) (alteration adopted) (quoting Conn, 526 U.S.

at 292); cf., Schware v. Bd. of Bar Examiners of N.M., 353 U.S. 232, 238–47 (1957) (holding

that a state cannot exclude a person from the practice of law for being a member of the Communist Party).

The vaccine mandate does not completely prohibit plaintiffs from conducting their business.  It merely makes vaccination a condition for certain occupations and businesses where the risk of contracting and transmitting COVID-19 is higher.  Given the nature and severity of the public health crisis, New York City has a rational interest in preventing unvaccinated individuals from working in jobs that require heavy contact with the public.  Additionally, while these emergency restrictions are in place, plaintiffs have other avenues to pursue their chosen professions.  They can run their current businesses through open-air dining, host concerts or live entertainment outside, mange drive-in or outdoor movie theaters, make sporting events outdoor affairs, or establish pick-up or delivery only policies.  Relatedly, nothing prevents unvaccinated patrons from obtaining service at restaurants either through outdoor seating or ordering take-out.

Thus, there is no substantive due process violation here, even if the temporary EEOs make it more difficult for plaintiffs to operate their businesses in New York City.  Marino v. City Univ. of N.Y., 18 F. Supp. 3d 320, 339 (E.D.N.Y. 2014) ("While a person's right to pursue the profession of his choice is recognized as a constitutionally protected liberty interest, courts in the Second Circuit have consistently held one must have no ability to practice one's profession at all in order to state a claim for deprivation of a liberty interest." (internal quotes omitted)).

### E. Freedom to Raise One's Children

As it affects their fundamental rights to raise a family, plaintiffs concede that New York City's policy is subject to rational basis review under Immediato v. Rye Neck School Dist., 73 F.3d 454, 462 (2d. Cir. 1996).  "There is a long line of precedents indicating that the government may not unreasonably interfere with . . . [the right to] raise one's children as one wishes."  Black

v. Beame, 550 F.2d 815, 816 (2d Cir. 1977).  Here, as discussed at length above, requiring

individuals to be vaccinated before allowing them to enter areas where disease transmission is

more likely is rational during a pandemic.  Moreover, although the EEOs prevent unvaccinated

individuals from taking their unvaccinated children into "covered entities," nothing in the law

requires plaintiffs to obtain a vaccine for themselves or their progeny.

**III.    Thirteenth Amendment**

Plaintiffs' invocation of the Thirteenth Amendment also does not carry water.  In the first

instance, the Thirteenth Amendment's prohibition of slavery and indentured servitude did not

introduce a

> novel doctrine with respect [to] services always treated as exceptional, and
> certainly was not intended to interdict enforcement of those duties which
> individuals owe to the State, such as services in the army, militia, on the jury, etc.
> The great purpose in view was liberty under the protection of effective
> government, not the destruction of the latter by depriving it of essential powers.

Butler v. Perry, 240 U.S. 328, 333 (1916); see also Immediato, 73 F.3d at 459 ("The Thirteenth

Amendment does not bar labor that an individual may, at least in some sense, choose not to

perform, even where the consequences of that choice are 'exceedingly bad.' . . . For example, a

state may require an attorney to work pro bono, or a doctor who has accepted scholarship funds

to perform pro bono services . . . without trenching upon the Thirteenth Amendment."  (internal

quotes and citations omitted)).  Requiring plaintiffs check patrons and employees' identification

and vaccination records is no different in process and effect than ensuring bars do not serve

alcohol to patrons under the age of 21.  The Thirteenth Amendment does not bar New York City

from requiring "covered entities" to check an individual's vaccine records and identification.

IV.     **Unconstitutional Taking**

Plaintiffs' brief barely raises this issue.  In a paragraph just preceding their Thirteenth Amendment claim, plaintiffs merely suggest that the EEOs' requirements will cause lost productivity and decrease the affected businesses' efficiency.  Then, following the Thirteenth Amendment claim, plaintiffs state "the commands of the Mayor are forcing businesses and their employees to labor in a manner which serves the Mayor's unacceptable policy ends . . . under threat of coercion."  Without more, these statements are insufficient for this Court to identify and evaluate a cognizable position.

The one concrete element of plaintiffs' argument concedes that the City's action is not a complete taking.  Specifically, plaintiffs' motion states the City's actions will lead to lost productivity, decreased efficiency, and fines, not the total loss of their business.  Thus, plaintiffs' argument appears to be that New York City has engaged in a non-categorical regulatory taking of their property.  See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency, 535 U.S. 302, 330 (2002) (A non-categorical taking may result from "[a]nything less than a complete elimination of value, or a total loss." (internal quotes omitted)); Sherman v. Town of Chester, 752 F.3d 554, 564 (2d Cir. 2014) (a regulatory taking occurs "when the government acts in a regulatory capacity.").

Plaintiffs have a heavy burden to establish such a taking.  See Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 493–94 (1987).  They must demonstrate that the balance of three factors weigh in their favor: "(1) the economic impact of the regulation . . . ; (2) the extent to which the regulation [ ] interfere[s] with distinct investment-backed expectations; and (3) the character of the governmental action."  Sherman, 752 F.3d at 565.

Apart from speculation concerning the impacts of the EEOs' penalty provisions, plaintiffs have not shown that economic damages are either imminent or permanent.  Quickly reviewing each of the Sherman factors demonstrates this.  In the first instance, the Mayor is restricted from issuing EEOs that last longer than thirty days.  N.Y. Exec. Law § 24(1) (Consol. 2021).  After this time has elapsed, he must renew the orders.  Consequently, plaintiffs must demonstrate to this Court that the EEOs they claim amount to takings are likely to be renewed for at least the foreseeable future.  Plaintiffs have not offered sufficient proof of this, let alone that these EEOs will be sustained indefinitely.

Moreover, while these EEOs are in place, plaintiffs can still conduct modified versions of their businesses to ensure unvaccinated patrons are served in non-indoor settings and indoor premises can operate in a limited capacity.  Thus, because plaintiffs have not shown that direct economic damage is unavoidable and their investment-backed expectations are unrecoverable, they cannot establish a harm sufficient to constitute a taking.

Usually, the third Sherman factor – the character of the government action – is the most elusive.  See John D. Echeverria, Making Sense of Penn Central, 23 UCLA J. ENVTL. L. & POL'Y 171, 186–99 (2005) (outlining nine possible definitions of "character").  But here, as stated above, the nature of the City's action is clear.  The EEOs' "whereas" clauses demonstrate that the Mayor signed them into law because of the perceived threats arising from the global COVID-19 pandemic.  Given the circumstances here, this is an appropriate and temporary government action.  See generally Penn Cent. Transp. Co. v. New York City, 438 U.S. 104, 125 (1978) ("[I]n instances in which a state tribunal reasonably concluded that 'the health, safety, morals, or general welfare' would be promoted by prohibiting particular contemplated uses of land, this

Court has upheld land-use regulations that destroyed or adversely affected recognized real property interests."  (quoting Nectow v. Cambridge, 277 U.S. 183, 188 (1928))).

## V.    The EEOs and New York Law

Plaintiffs also adopt the position that the EEOs amount to an improper aggregation of power on the part of the Mayor.  In support of this position, plaintiffs direct the Court to a Richmond County Supreme Court case, Indep. Rest. Owners Assoc. Rescue v. De Blasio, Index No. 85155/2021 (N.Y. Sup.Ct., Richmond County Sept. 10, 2021).  Then, plaintiffs proceed to the conclusory claim that the Mayor has improperly retained emergency executive authority in violation of New York law because the COVID-19 pandemic no longer merits emergency orders.

There is sufficient factual and legal support for the EEOs.  Although the most severe period of the COVID-19 pandemic appears to have subsided (hopefully) in New York City, a reasonable official could determine that the risk of a new surge in cases and hospitalizations has not.  This is especially true given the large number of New York residents who remain unvaccinated.  In such instances, "[t]he precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement."  S. Bay United Pentecostal Church v. Newsom, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring).  As a result, the unelected federal judiciary, lacking the "background, competence, and expertise to assess public health," should not second-guess these actions, particularly where "a party seeks emergency relief in an interlocutory posture, while local officials are actively shaping their response to changing facts on the ground."  Id. at 1614.[20]

---

[20] Plaintiffs' reliance on Indep. Rest. Owners Assoc. Rescue v. De Blasio, Index No. 85155/2021 (N.Y. Sup.Ct., Richmond County Sept. 10, 2021), is unavailing.  To the extent that the court in Indep. Rest. Owners expressed concern about the validity of the EEOs, this Court observes that New York law permits the Mayor to issue them. See Samantha Fry et al., State Emergency Authorities to Address COVID-19, LAWFARE (May 4, 2020), https://www.lawfareblog.com/state-emergency-authorities-address-covid-19.

Section 24(1) in Article 2-B of Chapter 18 of New York's Consolidated law provides that the chief executive of a county, city, town or village, in this case New York City's Mayor, can enact a state of emergency after finding an immediate or imminent public danger.  N.Y. Exec. Law § 24(1) (Consol. 2021).  During this state of emergency, the chief executive may promulgate local emergency orders that regulate and close "places of amusement and assembly," id. at § 24(1)(c), prohibit and control the presence of persons on public streets, id. at § 24(1)(e), and suspend local law, id. § 24(1)(g).

The law limits the Mayor's emergency powers in two ways.  First, it requires that any state of emergency declaration, and orders issued pursuant to it, last only thirty days.  Id. at § 24(1).  After that time has lapsed, the Mayor can, at his discretion, declare a continuance of the emergency for another thirty-day period.  Id.  Second, and more importantly, the locality's legislature can "terminate by concurrent resolution" any emergency orders at any time.  Id. at § 24(8).

In their reply, plaintiffs also contend that the Mayor's EEOs are preempted by federal law.  Specifically, 21 U.S.C. § 360bbb–3, which was created by the Food, Drug, and Cosmetic Act ("FDCA").  Under this provision, the FDA can issue an emergency use authorization for a vaccine that has not yet received full FDA approval, licensing, or been cleared for commercial distribution.  See id. § 360bbb-3(a)(2).  This section also states that anyone receiving a vaccine approved via an emergency use authorization must have "the option to accept or refuse administration of the product."  Id. § 360bbb-3(e)(1)(A)(ii)(III).  The same provision also requires those administering an emergency vaccine to disclose the consequences of refusing or accepting the product.  Id.

24

Based on the FDCA, plaintiffs conclude that the EEOs are invalid because they are an attempt to coerce unvaccinated New York residents into getting an emergency approved vaccine. But this position fails to recognize that these EEOs are not a mandate.  Although remaining in "covered premises" is now restricted for the unvaccinated, these EEOs do not criminalize an individual's choice to refuse a vaccine, nor do they seize their business.  Rather, as stated throughout this opinion, the EEOs adopt a rational policy tied to protecting the City's large unvaccinated population and ensuring the healthcare system is not overwhelmed by a spike in severe cases of COVID-19.

Thus, the EEOs here were issued pursuant to lawful processes under New York State law. If plaintiffs believe the thirty-day period for the declared state of emergency has expired or that the EEOs violate some other provision of New York or federal law, they have not brought it to this Court's attention.

## VI.   The Fourteenth Amendment's Privileges and Immunities Clause

Finally, plaintiffs request that we adopt a novel view of the Fourteenth Amendment's Privileges and Immunities Clause, contrary to that of both the Second Circuit and the Supreme Court.  Plaintiffs maintain that this Court should overrule century old Supreme Court precedent holding that the Fourteenth Amendment's Privileges and Immunities Clause only permits plaintiffs to assert rights guaranteed by the federal government and not those tied to state citizenship.  See Slaughter House Cases, 83 U.S. 36 (1872).  Because the law on this is so clear, plaintiffs conceded at oral argument that this point was made as a placeholder for appeal. Obviously, this Court has to follow existing precedent. See State Oil Co. v. Khan, 522 U.S. 3, 20 (1997); United States v. Diaz, 854 F. App'x. 386, 389 (2d Cir. 2021); Bach v. Pataki, 408 F.3d

25

75, 86 (2d Cir. 2005), <u>overruled</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>McDonald v. Chicago</u>, 561 U.S. 742 (2010).

## VII.   Balance of Equities and the Public Interest

Since plaintiffs' arguments on the likelihood of success on the merits fail, the remaining two factors need to be addressed only briefly.  Those who refuse vaccination may be harmed by the EEOs' restrictions.  It will undoubtably be difficult for plaintiffs to adapt to restrictions on public spaces that constitute their businesses, places of work, and the centers of their communal lives.  But New York City's "interest in combatting COVID-19 is at least equally significant." <u>Columbus Ale House, Inc. v. Cuomo</u>, 495 F. Supp. 3d 88, 94 (E.D.N.Y 2020) (quoting <u>League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer</u>, 814 F. App'x 125, 129 (6th Cir. 2020)).

COVID-19 has killed over 4.5 million people worldwide, with over 670,000 of those deaths taking place in the United States.[21]  We now are more familiar with the disease and have developed better methods and tools to reduce viral transmission and the infection's severity.  Of these new tools, vaccination is one of the most effective.  Vaccines have been found to provide more robust protection than antibodies from a previous COVID-19 infection[22] and reduce the potential for hospitalization as compared to the unvaccinated population.[23]

Again, the EEOs at issue are not a vaccine mandate.  Rather, they address the risks arising from a substantial portion of the population remaining unvaccinated as other COVID-19

---

[21] <u>WHO Coronavirus (COVID-19) Dashboard</u>, WORLD HEALTH ORGANIZATION (updated Sept. 23, 2021), https://covid19.who.int/.

[22] Cavanaugh A.M. et al., <u>Reduced Risk of Reinfection with SARS-CoV-2 After COVID-19 Vaccination — Kentucky, May–June 2021</u>, 70 MMWR MORBITY MORTAL WEEKLY REP., 1081-3 http://dx.doi.org/10.15585/mmwr.mm7032e1.

[23] Eli S. Rosenberg et al., <u>New COVID-19 Cases and Hospitalizations Among Adults, by Vaccination Status — New York, May 3–July 25, 2021</u>, 70 MMWR MORBITY MORTAL WEEKLY REP., 1306-11 http://dx.doi.org/10.15585/mmwr.mm7037a7.

26

restrictions are lifted.  The EEOs not only attempt to reduce the risk that unvaccinated

individuals will contract and spread the disease, but also ensure that New York City's healthcare

system is not overwhelmed.

I recognize that, over time, the way the EEOs balance these competing interests may

prove to be incorrect, especially if the long-term side effects of the vaccines turn out to be

calamitous.[24]  However, the voters of the City of New York elected the Mayor and City Counsel

to strike these balances as long as they are rational and, as shown above, either the Mayor or the

Council can end the EEOs at any time.  In contrast, no one voted for a federal judge to strike this

balance.  "[W]here good faith arguments can be made on both sides of the many issues raised by

the pandemic," the elected authorities, not the courts, must balance the competing public

interests.  Columbus Ale House, 495 F. Supp. 3d at 95; see also Newsom, 140 S. Ct. at 1613–14.

## CONCLUSION

Plaintiffs' motion for a preliminary injunction is denied.

**SO ORDERED.**

Digitally signed by
Brian M. Cogan
_____
U.S.D.J.

Dated: Brooklyn, New York
      October 10, 2021

---

[24] See, e.g., Sweden, Denmark Pause Moderna COVID-19 Vaccine for Younger Age Groups, REUTERS (Oct. 6, 2021), https://www.reuters.com/business/healthcare-pharmaceuticals/sweden-pauses-use-moderna-covid-vaccine-cites-rare-side-effects-2021-10-06/.