EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SHAW-NAE DIXON, THOMAS CASATELLI,
JEANETTE RIVERA, NATALIA YAKUBOVA,
CHRIS KING, ALISON MARCHESE, on behalf
of AM, JM, and MMV (her minor children),
WILLIAM MORRIS, GEORGE KABBEZ,
SHAW-NAE'S HOUSE, LLC, SALTY DOG
RESTAURANT, LTD, PER TAVERN CORP.
d/b/a THE KETTLE BLACK, CARGOSTORK
PARTIES, INC. d/b/a DO ME A FAVOR, and
INDEPENDENT RESTAURANT OWNERS
ASSOCIATION RESCUE, INC., individually,
and on behalf of all similarly situated individuals
and businesses.

Plaintiffs,

v.

ERIC ADAMS, in his official capacity as Mayor
of the City of New York and as successor to Bill
de Blasio, and THE CITY OF NEW YORK,

Defendants.

**Civil Action No. 21-CV-5090 (BMC)**

**AMENDED COMPLAINT
AND JURY DEMAND**

The plaintiffs, individually and on behalf of all similarly situated businesses and individuals, by and through their attorneys, Murray-Nolan Berutti LLC, with knowledge of their own acts, and upon information and belief as to all others, complain of defendants as follows:

## STATEMENT OF THE CASE

1.     The plaintiffs on their own behalves, and on behalf of all similarly situated business and individuals who are affected by New York City ("City") Emergency Executive Orders arising from the COVID-19 pandemic, are filing this Amended Complaint seeking to vindicate their

constitutional rights, federal statutory rights, and rights under New York statutes and laws. More specifically, the plaintiffs contend that all Emergency Executive Orders ("EEOs") of Mayors Bill de Blasio and Eric Adams at all times since June 24, 2021 including, without limitation, Mayor de Blasio's EEOs 225 (the "EEO"), 226, 228, 316, and 317, and   Mayor Adams' Emergency Executive Orders arising from the pandemic including, without limitation, EEOs 1, 2, 62, 65, 68, 71, 74, 77, 80, 83, 86, 89, 92, 95, 99, 103, 115, 119, 123, 127, and 131, are unauthorized under New York law, illegal under federal statutory law, and unconstitutional under the United States and New York constitutions.

2.      EEO 98 declared a state statutorily authorized state of emergency in the City, effective March 12, 2020, in keeping with N.Y. Exec. L. § 24 and/or § 28, as the COVID-19 pandemic began spreading across the state and New York Governor Andrew Cuomo declared a state-wide disaster. However, when the state-wide disaster declaration expired on June 24, 2021, so too did Mayor de Blasio, and now Mayor Adams' legal authority to promulgate EEOs based on the pandemic. Thus, all of the EEOs are illegal.

3.      While the urgency of the COVID-19 pandemic no longer exists, and Mayor Eric Adams has lifted the 'vaccine passport' restrictions which resulted in the initiation of the legal action on September 13, 2021, the legal principles involved with mayoral EEOs starting with EEO 225 (the "EEO") continue to be of the utmost importance, both to the plaintiffs particularly, given the damage done to their constitutional rights and the losses they have suffered, and to the nation in general, given that the exercise of fiat powers by two mayors deprived millions of their rights. Such rights must be fully and fairly adjudicated from the perspective of analyzing the legality of the EEOs and the remedies for the violations they caused, so that in the future, government may

2

properly be guided by the Constitution and laws, and not by illegal and unconstitutional power grabs, no matter how well-intentioned they may have been.

    4.     The EEOs have always been intended to coerce individuals to get vaccinated with COVID-19 vaccines. No fully approved FDA COVID-19 vaccine is generally available to the public, such that all COVID-19 vaccines are only available under the Food & Drug Administration's ("FDA") Emergency Use Authority ("EUA). All such EEOs violate federal statute 21 U.S.C. §360bbb (the "Statute"), which preempts conflicting laws or, in this case, unilateral mayoral decrees. Further a related informed consent regulation, 45 C.F.R. § 45.116(b)(8), provides that every person has an absolute right to refuse to accept an EUA vaccine without coercion, and without penalty for such refusal, which plainly is being violated with the EEOs.

    5.     Moreover, the question of whether defendants had and continue to violate the Fourteenth Amendment rights of the plaintiffs and citizens generally is ripe for consideration by our courts, since recent United States Supreme Court decisions have set a torch light to the path of Fourteenth Amendment jurisprudence which comports with the original meaning of such Amendment, including a potential reassessment of the Privileges and Immunities Clause thereof. While certain cases must be overruled by the Supreme Court to cause a reassessment of the Privileges and Immunities Clause itself, the path identified by Justice Clarence Thomas may easily be followed under existing jurisprudence with respect to the rights which the plaintiffs seek to vindicate. More specifically, objectors to the vaccine mandates whose enumerated constitutional rights are in question, or who have a fundamental life, liberty, or property interest which is being harmed, have a right to individual due process, and to the equal protection of the law.

3

6.      Even if there was authority, which is denied, the EUA vaccines themselves do not prevent transmission of the Sars-CoV-2 ("Sars-2") virus, which causes COVID-19 in some cases, and do not prevent individuals from becoming infected with the Sars-2 virus. Indeed, Mayor Adams presumably is fully vaccinated, yet on April 10, 2022, it was announced that he tested positive for Sars-2 and was in isolation. In fact, by their own Phase III studies, none of the available EUA vaccines from Pfizer, Moderna, or Johnson & Johnson ever provided an Actual Risk Reduction to those being injected of over 1.8% and, in the case of Pfizer, it was below 1%, meaning that there was a benefit from the Pfizer vaccine of under 1% for those injected with the Pfizer shot in its own clinical study. The widely bandied "93%" (or thereabouts) effectiveness rate of the EUA vaccines refers to the Relative Risk Reduction which, according to suggested federal guidelines, is a less-than-truthful standard of effectiveness if used for advertising purposes, and which should be compared with the Actual Risk Reduction number for purposes of truth in advertising if it will be used at all. Rather than look at the scientific facts, defendants simply and irrationally listened to what others said about those facts and concluded that mandatory vaccination somehow was an effective 'cure' for COVID-19. It never was. Not even close. The EEOs always were, thus, irrational.

7.      The EEOs are further irrational based on the admission of defendants' own expert, Dr. Jay Varma, who in opposition to the plaintiffs' original Order to Show Cause application, filed on September 13, 2021, asserted there to be no public health emergency when the EEO was promulgated, but rather, that there only was a public health concern. The EEOs do not trump constitutional rights even in an emergency, much less because of a "concern".

8.      Now, the absurdity and illegality of the entire EEO paradigm has been made crystal clear by Mayor Adams' EEO 62, which exempts professional athletes from the required obligation

4

to show proof of vaccination to work because of the "competitive disadvantage" they face, since "visiting teams can field unvaccinated players, and this competitive disadvantage has negatively impacted, and continues to negatively impact, New York City's teams' success, which is important to the City's economic recovery and the morale of City residents and visitors," as if restaurant workers, store clerks, police, fire fighters, hospital workers, teachers, lawyers, doctors, architects, tradesmen of all types, and anyone else kept from employment is not somehow more important than million dollar athletes supporting a billion dollar entertainment business.

9.     When Mayor Adams advised that he was going to promulgate EEO 62, defendants' own expert, Dr. Jay Varma, publicly wrote that the EEOs had become arbitrary and capricious, and were subject to legal challenge as a result.

10.     Since the inception of this action, the EEOs were always illegal and unconstitutional, and never had a true rational basis in terms of the science. Rather, they were and remain about show, and not about science, and plainly violated the civil rights of those who have been adversely impacted, those still adversely impacted, and those who may hereafter be adversely impacted by their illegal and unconstitutional overreach.

## THE PARTIES

11.     Shaw-Naè Dixon is an individual with an address of 91 Dubois Avenue, Staten Island, New York 10310.

12.     Thomas Casatelli is in individual with an address of 485 Davis Avenue, Staten Island, New York 10310.

13.     Jeanette Rivera is an individual with an address of 943 Gothels Road North, Staten Island, New York 10303.

5

14.     Chris King is an individual with an address of 27 Tenth Street, Staten Island, New York 10306.

15.     Alison Marchese is an individual living on Staten Island, New York, and is bringing a claim on behalf of her three minor children, AM, JM, and MMV.

16.     William Morris is an individual with an address of 164 Springfield Avenue, Staten Island, New York 10314.

17.     George Kabbez is an individual with an address of 7509 Third Avenue, Brooklyn, New York 11209.

18.     Shaw-Naè's House, LLC is a New York limited liability company, with an address of 381 Van Duzer Street, Staten Island, New York 10304.

19.     Salty Dog Restaurant, LTD is a New York S corporation, with an address of 7509 Third Avenue, Brooklyn, New York 11209.

20.     Per Tavern Corp. d/b/a The Kettle Black is a New York corporation, with an address of 8622 Third Avenue, Brooklyn, New York 11209.

21.     Cargostork Parties, Inc. d/b/a Do Me A Favor is a New York corporation, with an address of 126 Fingerboard Road, Staten Island, New York 10305.

22.     Independent Restaurant Owners Association Rescue, Inc. ("IROAR"), is a 509(c)(3) corporation, with an address of 7324 Amboy Road, Staten Island, New York 10307.

23.     Eric Adams ("Mayor") is the current Mayor of the City of New York, and the successor to Bill de Blasio, who was the Mayor of the City of New York ("Mayor de Blasio"), both of whom were State actors at all pertinent times herein.

24.     The City of New York ("City") is an incorporated City of the State of New York, and is a State actor.

6

25.     At all times pertinent, the Mayor and the City were State actors operating under color of law.

## JURISDICTION AND VENUE

26.     The plaintiffs' claims are brought pursuant to 42 U.S.C. § 1983 and 28 USC §§ 2201-02, as they arise from violations of the United States Constitution and seek declaratory and other relief, such that jurisdiction is appropriate, pursuant to 28 U.S.C. §§ 1331 and 1343.

27.     Supplemental jurisdiction is appropriate for claims not arising under the Constitution and laws of the United States, pursuant to 28 U.S.C. § 1367, because they are related to the federal claims within the meaning of that statute.

28.     All plaintiffs reside in the Eastern District of New York, and a substantial part of the events or omissions giving rise to the claims occurred, and a substantial part of the property that is subject of the action is situated, in the Eastern District of New York, such that venue is appropriate, pursuant to 28 U.S.C. § 1391(b)(1) and (2).

## FACT ALLEGATIONS

### A. Events since March 23, 2022

29.     On March 23, 2022, when this matter was on appeal to the Second Circuit Court of Appeals, defendants had filed a motion seeking to have the appeal deemed moot. Defendants argued that since Mayor Adams lifted the vaccine passport mandates arising from the EEO, the issue was moot. Mayor Adams' lifting of such mandate came only days after the plaintiffs filed a reply brief which detailed, among other things, how neither Mayor de Blasio nor Mayor Adams ever had any legal authority to promulgate any of the EEOs in question. Thus, it appeared that Mayor Adams lifted the vaccine passport because of the very real prospect that his authority to declare such EEOs was going to be determined to be non-existent.

7

30.     In opposition to the Motion to Dismiss, the plaintiffs asserted that the issues were capable of repetition but escaped review, and noted Major League Baseball teams faced the same types of mandates that Mayor Adams had withdrawn with respect to the plaintiffs herein, such that New York Yankees and New York Mets players who were unvaccinated would not unable to play home games, thus demonstrating how issues related to the illegal EEOs still remained, and did not end with the vaccine passport for restaurants and gyms being terminated.

31.     On March 23, 2022, defendants filed a reply brief wherein they asserted (Doc. 110), "there is no basis to assume that a renewed virus surge, if it someday occurs, would likely lead to readoption of Key to NYC, much less in its prior form," thus trying to wave away that evidence that the same legal problems still existed in a very public way.

32.     Then, on March 24, 2022, Mayor Adams ended the vaccine passport restriction only for professional sports teams, which arose from Mayor de Blasio's EEO 372, which required employees of City businesses to be vaccinated in order to appear for work, a requirement maintained by Mayor Adams after he was sworn into office. Although it appeared that Mayor Adams may have given the waiver for professional sports teams in order to steal an argument away from the plaintiffs herein, he asserted economic reasons for his decision, set forth in his EEO 62, and said, "We're doing this because the City has to function," thus demonstrating that EEO 62 was arbitrary and capricious, since highly paid athletes were exempted, while 'non-elite' police, firefighters, sanitation workers, and other private sector employees--including those in restaurants and gyms, still remain out of work due to their status as being unvaccinated.

33.     **In anticipation of Mayor Adams' announced ending to the vaccine passport requirement for sports teams, defendants' own expert, Dr. Jay Varma, wrote in a tweet: "This mandate has always been about NYC employers. It had legal standing because [it]**

8

**applied to all. The #KyrieCarveOut opens City up to [the] entire scheme being voided by
courts as 'arbitrary and capricious.'"**

34. On March 28, 2022, the Second Circuit Court of Appeals deemed the plaintiffs'
appeal to be moot, vacated this Court's Order denying a preliminary injunction, and remanded the
matter to this Court.

## B. The City's Mayor's Lack Legal Authority for their EEOs.

35. Since the time that the EEO was promulgated, there has not been a State declared
"state of disaster" which would permit a City Mayor to promulgate an EEO related to the
pandemic.

36. N.Y. Executive Law § 24 permits a city to declare a public emergency "which
extends to cases of '*disaster*, rioting, catastrophe or similar public emergency within the ... city'."

37. Defendants admitted in the Second Circuit Court of Appeals that the plaintiffs have
correctly quoted the statute "but overlook that the COVID-19 pandemic is a 'disaster' within  the
express terms of the Executive Law, as it represents an 'epidemic' that is causing an 'imminent ...
threat of wide spread or severe ... loss of life," such that the Mayor had authority to declare a local
state of emergency.

38. The City Council has limited the Mayor's authority to declare emergencies to the
defined and limited circumstances provided in the Administrative Code. Nothing suggests that the
Administrative Code's designation of authority was in any way "in addition to" the powers
permitted by § 24. Indeed § 24 specifically authorizes local government to limit the scope of a
Mayor's authority.

39. At all times pertinent, including today, the Mayor's powers to declare a state of
emergency are specifically curtailed by the Administrative Code, as was the City Council's right

9

pursuant to § 24. The City Council specifically limited the Mayor's authority to issuing local emergency declarations to "instances of public disorder and widespread disobedience of law which threatens civil order and the general welfare of the City," and then only for a period of five days. NYCAC §§ 3-104 and 107.

40.     The *only* source of authority for the Mayor to issue the EEOs based on an epidemic "disaster" could have come from the Governor, pursuant to N.Y. Exec. L. § 28(1), which provides, "Whenever the governor, on his own initiative or pursuant to a request from one or more chief executives, **finds that a disaster has occurred** or may be imminent for which local governments are unable to respond adequately, he shall declare a disaster emergency by executive order."

41.     No such disaster declaration was in effect when any of the EEOs were promulgated. Instead, the EEO was promulgated on August 16, 2021; but on Thursday, June 24, 2021, Governor Cuomo allowed the state of emergency based on the epidemic "disaster" to expire.

42.     Mayor de Blasio thus had no independent authority under the Administrative Code or otherwise to exercise emergency powers based on an alleged epidemic. Consequently, when the EEO was promulgated, the Mayor lacked authority to declare a state of emergency related to the purported epidemic.

43.     No subsequent state wide state of emergency has been declared which makes valid any of the EEOs that have been promulgated since such time, and the EEOs are unenforceable per defendants' own tacit admissions as to the purported basis for the Mayor's EEO authority with respect to the pandemic.

44. The EEO and all subsequent EEOs related to compulsory vaccination are, thus, void.

10

## C. The Critical Provisions of the EEO at the Inception of this Action.

45.     True and complete copies of EEO 225, EEO 226, and EEO 228, were attached to the Complaint as **Exhibits A, B, and C,** and are incorporated herein by reference.

46.     Section 1 of EEO 225 provides, in pertinent part, that "a covered entity" (which means, without limitation, the indoor portions of most commercial establishments, including restaurants and gyms) "shall not permit a patron, full- or part-time employee, intern, volunteer, or contractor to enter a covered premises without displaying proof of vaccination and identification bearing the same identifying information as the proof of vaccination."

47.     Section 2 of EEO 225 exempts nonresident performing artists and professional athletes/sports teams who are not regularly employed in the covered entity, while they are on the covered premises.

48.     Section 6 of EEO 225 provides, in pertinent part, that in "each instance that a covered entity fails to check an individual's vaccination status shall constitute a separate violation of this Order."

49.     Section 9 of EEO 225 provides, in pertinent part, "that any person or entity who is determined to have violated this Order shall be subject to a fine, penalty and forfeiture of not less than $1,000. If the person or entity is determined to have committed a subsequent violation of this Order within twelve months of the initial violation for which a penalty was assessed, such person or entity shall be subject to a fine, penalty and forfeiture of not less than $2,000. For every violation thereafter, such person or entity shall be subject to a fine, penalty and forfeiture of not less than $5,000 if the person or entity committed the violation within twelve months of the violation for which the second penalty was assessed."

11

**D. The "Emergency".**

50.    The EEOs ostensibly arose from a declared COVID-19 emergency in the.

51.    The Emergency was originally declared by the Mayor in EEO 98, dated March 12, 2020, at a time when the origin, associated dangers, and manner to control the coronavirus were all greatly unknown, and cases were precipitously rising to dangers levels such that the health and welfare of the entire City community was perceived to be in jeopardy and at risk.

52.    At the present time, the origin and manifestations of the coronavirus are becoming clearer, the associated dangers of the coronavirus--like most other illnesses--are now well-known, and cases continue to fall to levels infinitesimally smaller than the levels that existed at the time and in the immediate aftermath of EEO 98 being promulgated.

53.    Since March 12, 2020, and its immediate aftermath in the following few months, the number of deaths and hospitalizations dropped precipitously. COVID-related hospitalizations in the City, per https://www1.nyc.gov/site/doh/covid/covid-19-data-trends.page#epicurve, peaked on or around March 30, 2020, at around 1,850 daily hospitalizations--a truly substantial and alarming number at the time. The number of daily deaths peaked at slightly above 800 in the first week of April 2020--which unquestionably was a level of daily deaths caused by a single disease, that had not been seen for at least a century in the City.

54.    It has since been learned that most COVID deaths in the City (and New York State overall) in the Spring of 2020 resulted from a since-decried March 2020 Executive Order of Governor Andrew M. Cuomo, which required nursing homes to take in known COVID infected patients among the most vulnerable population of extremely elderly and those with co-morbidities. Thus, between March 25 and May 8, 2020, approximately 6,326 COVID-positive patients were

12

admitted to nursing homes, according to a state health department report, as revised, dated February 11, 2021. (https://www.health.ny.gov/press/releases/2020/docs/nh_factors_report.pdf).

55.    Unsurprisingly, the number of COVID-related hospitalizations and deaths in the City dropped precipitously once said official policy was rescinded.

56.    As of September 10, 2021, the seven-day average of COVID-19 positive tests (approximately 3.5%), total confirmed cases (1,135), probable cases (311), hospitalizations (65), and confirmed deaths (8), was on a downward trend. (https://www1.nyc.gov/site/doh/covid/covid-19-data.page)

E.    **Defendants' Premise is that the Already-Vaccinated Have Nothing to Fear, Such that the EEO Merely was a Coercive Measure by the Mayor to Effect Failed Policy Preferences in Violation of the Fundamental Constitutional Property and Liberty Interests of the Unvaccinated, Statutes, the Actual Science, and Rationality.**

57.    Vaccinated individuals have very little to fear with respect to COVID-19 if defendants were correct in innumerable pronouncements and/or admissions they have made and/or expressly adopted.

58.    Indeed, in response to an Order to Show Cause filed by the plaintiffs herein, one of the City's chief medical officers, Dr. Jay Varma, admitted in September 2021 that the pandemic emergency was over, and the COVID-19 merely had become a "concern". As noted above, Dr. Varma now calls Mayor Adams' policy "arbitrary and capricious".

59.    Further, taken at face value, the preamble to EEO 225 provided, in pertinent part, "between January 1, 2021, and June 15, 2021, over 98% of hospitalization and deaths from COVID-19 infection involved those who were not fully vaccinated."

60.    Extrapolating such numbers, of the 65 COVID-19 hospitalizations as of September 2021, only between 1 and 2 should be of a vaccinated individual.

13

## F. There are no Available Fully Approved COVID-19 Vaccines.

61. All readily available COVID-19 vaccines are EUA vaccines, as Pfizer's Comirnaty and Moderna's Spikevax are not in production in the U.S.

62. Further evidence of this is that EUA vaccines cannot be used if fully-approved alternatives exist, per the Statute.

63. None of the EUA vaccines, under optimal pre-variant circumstance, has an Actual Risk Reduction, which is the meaningful measure of protection given to individual injected with the vaccines, of even 2%. In Pfizer's case, the Actual Risk Reduction under optimal circumstances was under 1% based on the manufacturers' own studies, as the plaintiffs demonstrated in the Declaration of Dominick Pedulla, which previously was submitted to this Court, and the fact portions of which are incorporated herein by reference.

64. The widely discussed effectiveness percentage rates in the high 80s and low to mid-90s was based on Relative Risk Reduction, a relatively meaningless overall measure, the use of which to advertise and demonstrate actual effectiveness is misleading.

65. Indeed, in 2017, the FDA proposed guidance for "truth in advertising" purposes that provided that if a pharmaceutical company wanted to advertise a product's effectiveness, it should utilized "Actual Risk Reduction" and not "Relative Risk Reduction," and if Relative Risk Reduction was going to be used, it should be conspicuously compared with Actual Risk Reduction. Thus, actual scientific evidence from the manufacturers themselves demonstrates that the EUA vaccines were never effective in a meaningful, Actual Risk Reduction analysis, even under optimal pre-variant.

14

## G. Coercion of Individuals who are Unvaccinated Violates Federal Law.

66.     The Statute, 21 U.S.C. §360bbb (the "Statute"), compels that any person presented with the opportunity to take an EUA vaccine must only do so upon informed consent.

67.     Although many thousand are reported as having died from the EUA vaccines, and many thousands of vaccine-illnesses have been reported, such information is, at best, provided in the most cursory of manners to those being offered the EUA COVID-19 vaccines.

68.     Still others are misled into believing that fully FDA-approved COVID-19 vaccines are available for them to take, which is false.

69.     The informed consent provision of the Statute permits any person to refuse to receive an EUA vaccine.

70.     Moreover, the FDA's informed consent regulation, 45 C.F.R. § 45.116(b)(8), provides that anybody refusing to take an EUA vaccine, or who refuses to continue taking boosters or otherwise participating in such EUA program, may do so, "without penalty or loss of benefits to which the subject is otherwise entitled."

71.     Certainly, the ubiquitous federal statutory and regulatory scheme of FDA supervision over medicines, vaccines, medical devices, and therapies, does not provide a City Mayor the authority to override the Statute or the related informed consent regulation. Yet that is exactly what Mayor Adams, and Mayor de Blasio before him, have done by penalizing individuals who do not get EUA vaccines wish job loss and loss of society.

## H. Despite the Statute, the EEOs are Coercive.

72.     Despite the minuscule risk of serious infection to vaccinated individuals, EEO 225, and its progeny, including all other above-referenced EEOs, employed measures to coerce unvaccinated individuals to 'protect' themselves from other unvaccinated persons, under the

15

essential premise that the unvaccinated are presumed to be sick and diseased, and that they will spread COVID-19 to one another, such that City hospitals and morgues will be littered with the bodies of the unvaccinated. Such premise is false, based on the City's own health statistics.

73.     A reasonable inference can be drawn that the overwhelming majority of people who live in the City are aware of their ability to get vaccinated against COVID-19 easily, and at no cost. Indeed, the City originally expended over $125 million in advertising, most prominently directed at communities with a majority of minority residents, to promote getting vaccinated given the members of such communities' perceived "vaccine hesitancy".

74.     EEO 225 notes that "56% of City residents are fully vaccinated and 62% of residents have received at least one dose, and mandating vaccinations at the types of establishments that residents frequent will incentivize vaccinations, increasing the City's vaccination rates and saving lives."

75.     Thus, a full 38% of City residents had chosen to exercise their liberty not to get even a single vaccine shot, and a full 44% of City residents were not fully vaccinated--all at a time when positive tests, total cases, hospitalizations, and deaths, were dropping.

76.     Despite that, the draconian infringements on such liberties of the subject EEOs, including EEOs 316 and 62 which still require employees to be vaccinated, are being enforced in violation of federal and state law, and so that they will impair the fundamental rights of Plaintiffs and many others, have been crushing businesses in the City, have caused massive employment losses, and have caused major harm and disruption to life in the City for all people, especially in some of its most at-risk and underserved communities, such as the Autism spectrum community and minority communities. Such crushing of statutory rights and constitutional normalcy and liberty is occurring during what is a period of declining risk, even among the unvaccinated, per the

16

City's own statistics, for the reason that the former Mayor, and not through him the Mayor, wishes to "incentivize vaccinations, increasing the City's vaccination rates and saving lives", but without even the slightest accommodation for plaintiffs' fundamental rights.

## I. The Available EUA Vaccines are not Generally Safe or Effective.

77.     Nor are the vaccines particularly safe. For instance, through June 22, 2022, 15,205 preliminary reports of death caused by the vaccines were made to the U.S. Centers for Disease Control on its Vaccine Adverse Effects Reporting System ("VAERS"), which is believed to be a widely underutilized system, such that the reports likely reflect only a small percentage of suspected vaccine deaths. Worldwide, over 40,000 vaccine-caused deaths have been reported to government agencies.

78.     According to the website Openvaers, a private organization that publishes public CDC/FDA post-vaccine data, the VAERS system probably receives reporting as low as 1% of all vaccine injuries, thus making the actual numbers of vaccine deaths and injuries astronomical if accurate. (https://openvaers.com/openvaers)

79.     It also has been reported that Pfizer analyses released to the public on March 1, 2022, following litigation related to open public records access, that within the first 90 days of the vaccine's rollout, spanning December 1, 2019 – February 28, 2020, Pfizer received reports of 42,086 adverse events, including 1,223 deaths. Moreover, it received reports of some 158,000 different health problems associated with the Pfizer vaccine in only 90 days. Yet somehow, the Pfizer vaccine still is asserted to be "safe and effective". (https://www.theepochtimes.com/newly-released-pfizer-documents-reveal-covid-jab-dangers_4355020.html)

17

80.     There have been thousands of reported cases of myocarditis, pericarditis, Guillain-Barre Syndrome, anaphylaxis, and other deadly, dangerous, and/or life-altering medical conditions which are associated with the vaccines, per VAERS.

81.     Meanwhile, it has been proven time and again that those receiving the vaccine are both susceptible to being infected by Sars-2 and spreading it. Indeed, on April 10, 2022, Mayor Adams was reported to have tested positive for Sars-2 and was isolated.

82.     Anthony Fauci, M.D., who widely is considered to be the biggest proponent in the world of getting vaccinated with COVID-19 shots and boosters, and who has publicly stated that he twice has received boosters, has twice tested positive for Sars-2 since being 'fully boosted, and became very sick. As of June 30, 2022, Dr. Fauci was quarantined with COVID-19. (https://news.yahoo.com/anthony-fauci-says-covid-19-132739957.html)

83.     It is scientific fact that individuals may be infected by Sars-2 and may spread Sars-2 whether or not they are vaccinated. Moreover, as the death of former Secretary of State Colin Powell demonstrates, the mere fact of vaccination does not preclude death by COVID-19.

84.     The plaintiffs have submitted a Declaration of renowned expert Dr. Michael Babich, an immuno-pharmacologist who teaches medical school classes in the United States, and who has created his own vaccines which are on the market, who has provided the opinion that the so-called COVID-19 vaccines are scientifically incapable of giving people immunity, and that the more that people get boosted, the more likely it is that they are doing permanent damage to their health and, potentially, becoming vaccine dependent for multiple indications for which they had been immune or otherwise reliant on their own natural defenses to fight off, such as the common cold. Dr. Babich's Declaration provides that natural immunity is scientifically better than vaccine immunity, and that the COVID-19 vaccines are harmful to those with natural immunity, which

18

probably numbers in the tens of millions as of his Declaration, which is incorporated herein by reference.

85.    Dr. Babich further provides his studied scientific conclusion that every new variant of the Sars-2 virus will become weaker and less deadly as a matter of basic immunology, such that all things being equal, new variants will not pose as significant a risk of death to individuals as prior variants.

86.    Thus, the scientific evidence and the anecdotal evidence greatly refute the platitude that the vaccines are "safe and effective", and the long-term effects of the vaccines are completely unknown since they are experimental in nature. Meanwhile, fully FAA-approved vaccines are not available to the public, such that only EUA vaccines are available, the evidence for which has been provided to this Court and the Second Circuit Court of Appeals, all of which is incorporated herein by reference.

87.    Despite the plaintiffs providing the Declarations of Dominick Pedulla and Dr. Babich months ago, defendants never have refuted their analyses and opinions, but rather, simply have mouthed the words that the vaccines are safe and effective, and that they are the best way to protect against COVID-19 infection and transmission, an assertion that widely known experience has demonstrated to be palpably false.

## J.    The EEOs Institutionalizes Discrimination Purposely Aimed at the Fundamental Constitutional Liberties of African-Americans and Other Minorities.

88.    The EEOs were purposely directed to have the most significant impact on the fundamental constitutional rights of members of minority communities, most particularly African-Americans, but also Hispanics.

19

89.     Whereas 56% of City residents were fully vaccinated at the time EEO 225 was promulgated, and 62% had received at least one dose--meaning they were not subject to the restrictions imposed by the EEO--*the Mayor knew that African-American residents will suffer in much greater percentages*, thus making the EEO purposely discriminatory against suspect classes of the City's residents, without compelling reason, and without the narrow tailoring required by constitutional law.

90.     Even beyond legal and constitutional protections for African-Americans that were disregarded by defendants, on March 23, 2021 the Mayor announced a Racial Justice Commission because, in his words, "We've never had a model for actually addressing structural racism, institutional racism, identifying it, acknowledging it, formally apologizing for it, weeding it out, eradicating it, making the policy changes, changing the laws, doing the things that will actually have a lasting impact". Yet with his EEOs 225, 226, 228, Mayor de Blasio actually and openly created structural and institutional racism against African-Americans and Hispanics.

91.     Many African-Americans, who justifiably have long memories of being used as guinea pigs with a pernicious syphilis experiment beginning in 1934, known as the "Tuskegee experiment", (see http://richmondfreepress.com/news/2021/jan/07/we-were-medical-guinea-pigs-julianne-malveaux/), are very clear that they will not again be used as guinea pigs for largely unproven and untested vaccines--especially relative to other vaccines which took years to develop before being used among the general population--without knowing their long-term effects. (See https://www.nytimes.com/2020/10/07/health/coronavirus-vaccine-trials-african-americans.html.)

92.     Since January 31, 2021, the Mayor has primarily targeted minority communities with advertising aimed at eliminating "vaccine hesitancy" in those communities. The Mayor's effort largely has failed, not from lack of trying, but because a substantial majority of minority

20

residents, most particularly African-Americans, do not want to take the vaccine. Thus, the Mayor
is now attempting to force those who disagree with his vaccine policy to fall into line via his
coercive EEO, in violation of their constitutional liberty interests.

93.     As the Mayor knew, as of September 13, 2022, the City's most recent data revealed
that only 36% of African-Americans are fully vaccinated, and only 42% had received at least one
shot. (See https://www1.nyc.gov/site/doh/covid/covid-19-data-vaccines.page#people.)

94.     Similarly, Latino/Hispanic residents were are vaccinated at rates below the City's
average. (Id.)

95.     Perhaps most shocking is that the former Mayor did not confront or express the
truth about his EEOs--which is that he specifically designed them with knowledge that his policy
of seeking to convince African-American and Hispanics to get vaccinated at much higher rates has
failed--such that now he used his putative emergency powers to create misery for tens of thousands
of City residents who belong to such suspect classes, so as to coerce them into yielding to his
desired outcome.

96.     Each individual has a fundamental enumerated constitutional right not to be
discriminated based on race, and the EEOs deprived African-Americans and Hispanics from same
without due process and without application of strict scrutiny in an Equal Protection context.

### K.  The EEO Violates Other Constitutional Rights to Life, Liberty and Property.

97.     In his Opinion in *New York State Rifle & Pistol Association v. Bruen*, 597 U.S.
____ (2022) (No. 20-843), Justice Clarence Thomas noted that the Second Amendment is not a
"second-class" constitutionally enumerated right.

98.     In his Concurring Opinion in *Dobbs v. Jackson Woman's Health Organization*, 597
U.S. ____ (2022) (No. 19-1392), Justice Thomas reflected on the Fourteenth Amendment's

21

Privileges and Immunities Clause, the notion of "substantive due process", and the Equal Protection Clause, which provided a balanced and harmonious analysis of the original intent of those who passed and adopted the Fourteenth Amendment, asserting that "in future cases, we should follow the text of the Constitution which sets forth certain substantive rights that cannot be taken away and adds, beyond that, a right to due process when life, liberty, or property is be taken away."

99.     Thus, all enumerated rights are first class rights which must be examined under strict scrutiny principles, or something approximating the same, when threatened by government action. Further, all incursions into an individual's life, liberty, and property interests are fundamental rights which require individualized due process for the people affected thereby.

100.    Other than being racially discriminatory, the EEOs violate several enumerated constitutional rights, and several rights to life, liberty, and property which compel at least procedural due process for the individuals opposed to receiving COVID-19 vaccines who are so impacted.

101.    The preamble of EEO 225 recognizes that there are those "who are ineligible for the vaccine, due to age, health or other conditions," yet neither the EEO nor any of its progeny makes exemptions from its burdens for those who are ineligible for the vaccine, due to life-threatening condition, age, health or other conditions, thus potentially depriving any person coerced by their liberty and, potentially, their life.

102.    More specifically, the EEOs placed those at high risk of death or other serious health consequence if they take the vaccine in the bind having to decide whether to take a potential life-risking vaccine, or to forfeit a normal life. This causes a government-created danger for many of such individuals (including certain of the plaintiffs), both objectively and as to their right to

self-determine what is safest for themselves, based on their own specific health characteristics as determined by their own self-evaluation arising from their fundamental constitutional life and liberty interests in so doing.

103.     Each individual has a constitutional liberty interest in bodily integrity, which allows all such individuals to balance the relative risks of the health choices they are constitutionally entitled to make, against the potential reward of taking such risks, especially absent a compelling and supportable State conclusion of a clear danger posed by such individuals to the public.

104.     Each individual is different, and their individual medical circumstances cannot be ignored or discounted because a Mayor, by fiat, wishes there to be an impersonal mandate that people get vaccinated with an EUA vaccine, as has happened, which continues to happen with employees, and which stands to happen again in the future. Thus, each individual is minimally entitled to due process to determine whether they should be permitted an exemption to any vaccine mandate, let alone the one here, where the Mayor seeks to coerce and actually is punishing individuals who refuse an EUA vaccine.

105.     Each parent has a fundamental liberty interest in the upbringing of his or her children and is entitled to due process prior to denial of same. Thus, each objecting parent has a right o be administratively heard, and not simply lumped into a mass of "the unvaccinated" who are 'violating' mayoral fiat.

106.     The EEO provided no exception for parents who do not want their 12-17-year-old children to be vaccinated for any reason, but rather discriminates against the age 12 to 17 class based upon their being unvaccinated, including now, without limitation, in employment per EEO 316, 62, and 71. Based on the City's data at such time, only 20% of such class of children has received at least one shot, and 16% are fully vaccinated. Thus, a full 80% of children aged 12-17

23

were barred by the Mayor from entering most City commercial establishments unless their parents yield to the Mayor's coercive EEO, and cause their children to be vaccinated, against the parents' better judgment in the exercise of their constitutionally-protected parental rights.

107. Each person has a fundamental enumerated constitutional right to be exempt from indentured servitude, yet the EEOs coerced employers to work as agents for the City to ensure that the Mayor's vaccine EEOs are enforced, failure of which could generate large fines. Consequently, the EEOs denied Equal Protection to employers and other who were compelled in a *de facto* capacity as the Mayor's enforcement agents.

108. Each person has an enumerated constitutional right to freely exercise his or her religious sincerely held objections to receiving EUA vaccines, and is entitled to the equal protection of the law and strict scrutiny of any attempt at deprivation of the same. Yet the EEOs fail to provide for religious exemptions, while even on September 13, 2020 shielding entertainers and athletes to some degree or other from the effects of the EEOs, and now outright exempting professional athletes, while religious objectors suffer harm.

109. Each person has a liberty and/or property right in his or her choice of employment, and is entitled to due process prior to deprivation of same.

110. Consequently, while defendants may believe it to be desirable for individuals to 'protect' themselves from COVID-19 by keeping them outdoors, even in the coldest weather, with other purportedly 'high risk' unvaccinated individuals who also do not see the world through the same eyes as the Mayor and former Mayor--all of whom the EEOs essentially presume to be sick, spreaders of COVID-19, and menaces to society--the Constitution and laws do not permit defendants to force such view on the plaintiffs by threatening confiscatory penalties, social misery, and now unemployment.

24

111.    Indeed, in light of the lack of safety or effectiveness of the vaccines and the unequal application of the EEOs, the EEOs are, and always were, arbitrary, capricious, and irrational, while also being statutorily unauthorized.

112.    The plaintiffs and all similarly situated individuals who have been harmed in their enumerated constitutional rights, and also in their right to life, liberty, property, federal statutory and administrative protections, state statutory protections, and otherwise suffered permanent and irreparable injury from the EEOs and had and continue to suffer, without limitation, economic damages, mental anguish, physical injury, pain and suffering, and emotional distress.

## THE PLAINTIFFS

### Shaw-Naè Dixon

113.    Shaw-Naè Dixon was declared legally dead on September 11, 2020, based upon what is an unknown and mysterious ailment with which she was suddenly stricken.

114.    Dixon previously had no health problems, and was fortunate to be revived by doctors after being transported to a local hospital.

115.    Dixon, who has just celebrated her first "re-birth day", has been told by her doctors that she cannot take the vaccine, because she may die in light of the unknown cause of her previous death.

116.    Dixon is an African-American woman, and thus belongs to a specifically targeted suspect class of persons by the purportedly facially neutral EEO.

117.    Shaw-Naè's House is Dixon's restaurant, which caters to a majority of African-American customers, most of whom are unvaccinated and who refuse to be vaccinated.

25

118.    As a result of the EEO, Dixon will not be allowed to work in her own restaurant, nor will her unvaccinated employees, and most of her patrons--the majority of whom are African-Americans--will not be permitted to enter the restaurant.

119.    As a result of the EEO, Dixon, who is a proud and successful African-American female business owner, will effectively be put out of business, and all of the African-Americans described above will have their fundamental rights impaired. Dixon reasonably perceives the EEO as discriminatory.

120.    Further, through her entity, Dixon employed people who are unvaccinated, or may with to do so, but cannot because of EEOs 316, 62, 71, and any progeny, which preclude unvaccinated individuals from working at City businesses. Such allegation applies for all of the plaintiff businesses herein.

### Thomas Casatelli

121.    Thomas Casatelli is a true American hero.

122.    After serving with the United States Marine Corps in the Persian Gulf War, Casatelli became a New York Firefighter, who was already highly decorated prior to 9/11/01.

123.    On 9/11/01, Casatelli worked between both the North and South Towers to save lives.

124.    Casatelli was the sole survivor of his company from the 9/11 attacks.

125.    Casatelli suffered with Post-Traumatic Stress Disorder ("PTSD") and Survivor's Guilt related to the trauma he suffered on 9/11, and was forced to retire from the FDNY.

126.    Casatelli thereafter invested in the plaintiff Per Tavern Corp. d/b/a The Kettle Black, which gave him a sense of self after having to retire from the FDNY.

26

127.    However, for years after 9/11, Casatelli self-medicated his PTSD by drinking, which ultimately caused his failure to pay New York State and City taxes on behalf of the Kettle Black.

128.    As a result, Casatelli was indicted, pled guilty, was sentenced to 90 days at Riker's Island, and was fined and penalized for a total amount of $1,300,000.00.

129.    Following his release from prison, Casatelli began the process of rehabilitation over several years.

130.    Casatelli and his business associates took out second mortgages and loans to pay off the $1,300,000.00 debt, all of which was paid off over 12 years.

131.    Casatelli paid his debt to society, now no longer drinks, and is a peer mentor for fireman and military veterans who suffer with PTSD, which is an underserved community.

132.    The Kettle Black has given Casatelli a platform from which he can serve as a staple of the community, and represents his 'new' life's work. Jeopardy to the Kettle Black equates to a threat to destroy Casatelli financially, and personally.

133.    Casatelli will not get vaccinated, as he does not believe that he is a likely candidate for death or serious debilitating illness as a result of COVID-19, has concluded that the risks to his health outweigh the benefits, and otherwise believes that the science is not yet fully formed on the issue of the long-term efficacy, and the effects of COVID-19 vaccines.

134.    Because of the EEO, Casatelli will not be able to work at The Kettle Black, will not be able to meet his 'partnership' obligations, and will not be paid.

135.    The Kettle Black will also have to hire individuals to check vaccine cards, and/or employees will become less efficient and, therefore, costlier (in the sense of lost productivity, since the business and its employees are being coerced into working for the defendants with respect to

27

checking COVID-19 records and identifications of every single patron, all without compensation), and contrary to their conscientious beliefs about their patrons' rights, but at the sole cost and expense of The Kettle Black.

136.    Castelli is terrified that he will not be able to work at The Kettle Black because of the EEO, and that he will again have his sense of self, as well as his livelihood, taken away from him--only this time, from the government which is supposed to protect him--and he will be unable to fulfill his obligations to his partners because of the EEO.

### Chris King

137.    Chris King is a business associate of Casatelli at The Kettle Black.

138.    King has been advised by his doctors that he has natural immunity to COVID-19, and that such natural immunity is a better defense to COVID-19 than the vaccine would be, and that the risks of taking the vaccine are thus unnecessary.

139.    King has thus exercised his constitutional right to determine his best medical course, and not undergo vaccinations that pose all risk and no benefit to him.

140.    King therefore will not get vaccinated and, thus, stands to lose his job because of the EEO.

King will be unable to fulfill his 'partnership' obligations to his business associates as a result of the EEO, and therefore will lose his income from The Kettle Black.

### Jeanette Rivera

141.    Jeanette Rivera is a grandmother of, and a contributing caregiver for, a 4-year-old girl, who attends the Do Me A Favor gym in Staten Island, New York.

142.    Rivera is disabled due to having suffered through, and survived, seven brain aneurysms and a stroke.

28

143.   Rivera has been instructed by her doctor not to get the vaccine, as it may cause her death or serious medical complications.

144.   If Rivera does not get vaccinated, the EEO will prevent her from taking her granddaughter to the gym, and otherwise will prevent her from consorting with people in the City at indoor venues, such as restaurants.

145.   Thus, the Mayor has presented Rivera with a choice--either risk death and get vaccinated against doctor's orders, or literally be cast out of the places and things that bring joy and meaning to her and her granddaughter's lives, in the exercise of their rights as citizens to associate with and engage in personal and commercial activities equally with other citizens.

146.   Rivera is an Hispanic-American, recognizes that Hispanics so far have been less likely than members of non-suspect classes to get vaccinated, and reasonably perceives the EEO as being discriminatory.

**Natalia Yakubova**

147.   Natalia Yakubova is an individual who has sincerely held religious beliefs as a Catholic, and who follows the recommendations of the National Catholic Bioethics Center, among other Catholic tenets which may not fall in line with the Vatican.

148.   Based upon her sincerely held religious beliefs, Yakubova will not get vaccinated for, among other reasons, the use of aborted fetal cells by the companies whose vaccines are available in the testing of such vaccines.

149.   Yakubova is only 32 years old, takes care of her health, and is not of an age where she is at significant risk of death or serious long-term health complications from COVID-19.

29

150.     Yakubova will, however, be precluded by the EEO from maintaining the healthy lifestyle that she currently maintains, since she will be barred from gyms due to her vaccination status.

151.     Similarly, Yakubova frequents many restaurants and eateries in the City, but now will be institutionally discriminated against, based upon her sincerely held religious beliefs, which preclude her from getting the vaccine.

152.     The aggregate risk to the public from such conscientious vaccine decliners is negligible and the failure to include an exception for religious objectors not only cannot be supported by a compelling State interest, but is irrational, particularly in light of the outright exemption for professional athletes and others which has been provided by the Mayor's EEO 62.

**George Kabbez**

153.     George Kabbez is one of the shareholders of Salty Dog Restaurant, LTD.

154.     Kabbez has been advised by his doctor not to get vaccinated, due to medical issues which he wishes to keep private.

155.     Like the other Plaintiffs, Kabbez has a constitutional right to make such decision and to have the government respect same.

156.     Because of the EEO, Kabbez will be unable to work at the Salty Dog because of his vaccination status.

157.     The Salty Dog will further have to incur unnecessary labor costs and expenses in order to effectuate the EEO's mandates as to checking COVID-19 vaccination cards, such that the Salty Dog will essentially be put into the service of the City without compensation.

30

158.    Finally, there is a significant chance that the damage to the Salty Dog's business, which will be caused by the EEO on the heels of the 2020 COVID shutdowns and restrictions, will force it permanently to close its doors.

**Alison Marchese**

159.    Alison Marchese is a restaurant owner and has three minor children, ages 12 to 17, referenced to herein as AM, JM, and MMV, the same being the initials of such minor children.

160.    Alison Marchese is fully vaccinated, and has no objection to unvaccinated or vaccinated persons coming to the restaurant, and dining inside.

161.    Despite being vaccinated herself, Marchese does not believe that children should be vaccinated, and has made the parental choice not to allow her children to be vaccinated.

162.    More specifically, Marchese has widely read on the subject, and is aware that there are no studies that have been, or could have been, conducted as to the long-term effects of the COVID-19 vaccines on children, which therefore creates an unnecessary risk of harm to them should they become vaccinated without corresponding benefit to them due to their very low-risk status, and with negligible public risk.

163.    Since Marchese's children are not in a high-risk category, Marchese refuses to allow her minor children to be vaccinated.

164.    Because there is no exception in the EEO for age 12 to 17 children whose parents have not allowed them to be vaccinated, Marchese's children will not be allowed to visit her restaurant, even when she needs to look after them there, and otherwise will be precluded from most indoor activities within the City.

165.    Since only 20% of City's children between 12 and 17 are vaccinated, it can reasonably be inferred that most parents do not want their minor children to be vaccinated.

31

166.    Because Defendants well know these facts, the EEO is designed to force parents to choose between (a) their best judgments and constitutionally-protected decision-making about their own children's health and upbringing, and (b) trying to maintain a normal lifestyle for their children, by forcing them to get vaccinated so they may enjoy all the benefits of society, which are otherwise threatened by the EEO during the time of life when they are supposed to enjoy the freedom of youth.

167.    The self-avowed compulsion (created by the EEO), to force parents to vaccinate such children, constitutes an unconstitutional government-created danger, and a deprivation of their liberty interest in directing the upbringing of their children.

**William Morris**

168.    William Morris is an individual who owns Do Me A Favor Gym, together with his wife, Jessica. Both are unvaccinated.

169.    Morris served for 21½ years in the United States Marine Corps Reserves, and was called to active duty three times for a total of almost four years, including serving two tours of duty in Iraq as an Infantry Mortarman.

170.    Morris suffers with PTSD and is 80% disabled.

171.    Morris also has served 15 years for the Department of Homeland Security as a United States Air Marshal, and is now in the process of retiring.

172.    Morris, together with his wife, opened Do Me A Favor Gym, which primarily serves children who are in the underserved "Autism spectrum community."

173.    Do Me A Favor Gym offers such children an opportunity to socialize and to exercise in ways that they do not typically have available to them given their conditions.

32

174.    Many of the parents of children in the Autism spectrum community will not get the COVID-19 vaccines, as they believe that vaccines have caused Autism in their children.

175.    William Morris will not get vaccinated, because he does not believe himself to be likely to suffer long term health effects of COVID-19, and otherwise wishes to stand in solidarity with most of the parents of children in the Autism spectrum community, who are not getting vaccinated.

176.    As a result of the EEO, Do Me A Favor Gym will have to close, thus cutting off services to the underserved Autism spectrum community, and otherwise putting William Morris, his wife, and others, out of work, and his gym out of business.

## Independent Restaurant Owners Association Rescue, Inc. ("IROAR")

177.    IROAR is a not-for-profit "509(c)(3)" corporation, which includes membership of approximately 200 City restaurants, and which advocates for City restaurants. Such restaurants constitute one of the City's most important commercial and cultural elements. Many restaurants operate on low margins to begin with, which have now been stripped to the bone.

178.    City restaurants have been severely challenged by the pandemic and damaged by the EEOs, and only now are starting to get back on their feet, to the extent they have survived.

179.    The restaurant business is also suffering with a crushing labor shortage, and most restaurants are struggling to survive, and restaurant employees, contractors, and delivery-people all are adversely affected by EEO 372 and its progeny.

180.    The EEOs restrict the ability of owners, managers, employees, and contractors who are unvaccinated, and formerly prevented unvaccinated customers, from entering business premises.

33

181.    Additionally, while the EEOs forced and continue to force reduced management, employment, and customers for City restaurants, they mandated that restaurants and, through the businesses--which include sole proprietorships--their managers and other employees, must check the vaccine status and identification of every person attempting to dine in a restaurant.

182.    Thus, the labor, costs and burdens of the EEO, including lost productivity costs, were and are borne by the restaurants, which were compelled to be enforcement agents of the Mayor.

183.    Further, the EEOs will require restaurants to discriminate against individuals based on health status, race, religious conviction, health status, and other factors, all of which are likely violate the law, exposed restaurants to lawsuits, and caused restaurants, their owners, managers, and employees to act in a discriminatory manner which is abhorrent to all, against their wishes.

184.    Without any basis, excluded from the EEOs were things such as banks, where people could come and go and congregate, high rise buildings where social events could be held, and similar such venues where individuals could congregate, but which were not necessarily at the heart of the City's cultural and social life, such as restaurants, gyms, and entertainment venues. Thus, the EEOs in question consciously targeted "social normalcy" so as to coerce individuals into becoming vaccinated against their will, when other venues were equally capable of spread, but were not covered.

185.    Included in groups with low vaccination rates, against whom the Mayor compelled discrimination by restaurants, are African-American, Hispanics/Latinos, youths aged 12-17, many religious Christians, and the Orthodox Jewish community.

34

186. Such mandates are coerced by the EEO under threat of crushing fines, such that restaurants, their owners, managers, and other employees suffered same as literal indentured servants of the Mayor, without any additional compensation, but only with added costs.

187. Further, the ability and fundamental constitutional right of patrons and staff to associate with vaccinated and unvaccinated individuals of their own choosing is largely destroyed by the EEO, which creates two classes of people (beyond absurd exceptions for athletes and entertainers) as if no vaccinated person would ever want to associate with an unvaccinated person, and vice versa, which is a complete and total fallacy.

**Similarly Situated Individual and Businesses.**

188. Millions of other City residents, City businesses, and those who seek to work and enjoy the City have also been adversely affected in their rights, and have suffered damages based on any and all of the EEOs promulgated by Mayors de Blasio and Adams. Every allegation set forth above with respect to the named defendants may also apply to the unnamed defendants, such that they have suffered damages in like kind and manner as the named plaintiffs, who also not bring this action on their behalf with respect to the EEOs that may have or which continue to adversely affect them.

## FIRST COUNT
### (Equal Protection-Racial Discrimination)

189. The plaintiffs repeat and reassert each and every allegation above, as if fully set forth herein at length.

190. The EEOs, though facially neutral in their wording, knowingly treat minorities, especially African-Americans, differently from others similarly situated.

35

191.    Defendants know that the EEOs disparately impact the rights and lives of African-Americans and Hispanics to a much greater percentage degree than members of non-suspect classes.

192.    The totality of circumstances reveals that such unequal treatment under the EEOs are based on impermissible racial classifications.

193.    It is intended by defendants that the EEOs' restrictions would coerce African-Americans and Hispanics to get EUA vaccines against the free will of their best judgment and wishes for themselves and their children

194.    The EEOs thus purposely institutionalized onerous and unconstitutional restrictions on their liberty and, with respect to minority business owners, their property, in an effort to coerce members of such communities to get vaccinated against their wills, and against their fundamental constitutional rights.

195.    Indeed, in light of the known fact that some 59% of African-Americans in the City were to be deprived of most indoor commercial activity, with his EEOs, Mayor de Blasio effectively told most African-Americans in the City that effective September 13, 2021, they cannot sit at the lunch counter, and now, per Mayor Adams, may not work in the City unless they are ballplayers for the New York Yankees, New York Mets, or other professional sports team.

196.    Beyond being despicable, such shocking conduct by defendants violates the Fourteenth Amendment of the United States Constitution, as well as Art. 1 § 11 of the New York Constitution, such that EEOs are unenforceable, and have caused damage.

36

## SECOND COUNT
### (Due Process-Right to Bodily Health and Integrity)

197.    The plaintiffs repeat and reassert each and every allegation above, as if fully set forth herein at length.

198.    The EEOs deprive liberty to individuals who have *bona fide* medical exceptions to being vaccinated, including, but not limited to, plaintiffs Dixon, Rivera, King, and Kabbez.

199.    Similarly, by virtue of the EEOs' coercive mandates, all plaintiffs, including the children on whose behalf Marchese brings suit, and all other unvaccinated residents of and visitors to the City, are deprived of their liberty, and potentially life interests to bodily integrity protected under the Fourteenth Amendment of the United States Constitution.

200.    Each individual comes to the question of whether to be vaccinated with his or her own set of circumstances. Indeed, in the seminal legal case concerning vaccinations, *Jacobson v. Massachusetts*, 197 U.S. 1 (1905), before reaching the question of whether the vaccine mandate in question was constitutional as applied to the plaintiff, the U.S. Supreme Court noted that there was no indication that the vaccine in question could be life threatening or otherwise physically intolerable to the plaintiff, meaning that such questions must predominate for each person before he or she may be compelled to be vaccinated, where such compulsory vaccination otherwise may be appropriate.

201.    In other words, *Jacobson* is in harmony with Justice Thomas' concurring proposition in *Dobbs* that every single person who is deprived of his or her fundamental rights to life, liberty, and property, as is the case herein, is entitled to due process.

37

202.   Such due process is owed on an individual basis and may not be lumped into a general class of "the unvaccinated," all of whom are treated the same without procedural concern for their individual circumstances.

203.   No compelling governmental interest or otherwise exists which provides defendants with the license to so intrude upon such fundamental constitutional rights; and as to any such putative interest, the EEO is not narrowly tailored as is constitutionally required--quite the opposite, or even is rationally related under the circumstances to a legitimate government objective.

204.   The coercive EEO, in fact, unconstitutionally creates a danger to the lives and health of said plaintiffs and others, are irrational, and have caused damage.

### THIRD COUNT
### (Equal Protection—Free Exercise)

205.   The plaintiffs repeat and reassert each and every allegation above, as if fully set forth herein at length.

206.   The EEO violates the First and Fourteenth Amendments of the United States Constitution, in that it makes no exceptions for those who have *bona fide* religious objections to receiving a vaccine, thus unconstitutionally burdening the plaintiffs' and others right to the free exercise of their religious objections to such vaccination.

207.   The failure to provide for religious exemptions by the State actors, Mayor and City, acting under color of law, shocks the conscience, particularly in light of the blanket exemption provided to professional athletes, and is without compelling basis, such that the subject EEOs including, without limitation, EEO 316, 61, and 72, for which defendants are fully culpable, may

38

not be enforced under the United States Constitution, and/or Art. 1 § 3 of the New York Constitution, and have caused damage.

## FOURTH COUNT
### (Due Process-Right to Direct One's Children's Upbringing)

208.    The plaintiffs repeat and reassert each and every allegation above, as if fully set forth herein at length.

209.    The EEOs violate the Due Process Clause of the Fourteenth Amendment of the United States Constitution, in that it impairs, penalizes and deprives parents, including Marchese, of their rights to direct the upbringing of their children, which is a protected liberty interest, including her determination not to have her 12 to 17-year-old children get vaccinated against COVID-19, similar to countless similar determinations made by the most or many of New York's (and the nation's) citizens who are parents.

210.    The State actors, Mayor and City of New York, are fully culpable for the deprivation of such fundamental rights, and are operating under color of law, which shocks the conscience, such that EEOs may not be enforced under the United States Constitution and have caused damage.

## FIFTH COUNT
### (Substantive Due Process-Right to Hold Specific Private Employment and Follow a Chosen Profession)

211.    The plaintiffs repeat and reassert each and every allegation above, as if fully set forth herein at length.

212.    The EEO mandates that unvaccinated individuals, including business owners and their employees, be driven outdoors or out of work altogether, such that they cannot work in the

39

specific private employment that they desire, or otherwise engage in their chosen professions, a fundamental liberty interest under the Fourteenth Amendment of the United States Constitution.

213.    Moreover, EEO 316 outlaws employment of the unvaccinated in the City, which only had been modified to protect professional athletes and entertainers by EEO 62, which is discriminatory against all other individuals.

214.    Plaintiffs Dixon, Casatelli, King, Kabbez, and Morris, among hundreds of thousands of others, were being deprived of such constitutional right by the State actor defendants, who are acting under color of law in a manner which shocks the conscience, such that the EEOs cannot be enforced, and have caused damage.

**SIXTH COUNT**
**(Thirteenth Amendment: Indentured Servitude)**

215.    The plaintiffs repeat and reassert each and every allegation above, as if fully set forth herein at length.

216.    In addition to the racial protections it offers, the Thirteen Amendment of the United States Constitution also prohibits indentured servitude in a way that is directly applicable to the EEO's coercion of both (a) the plaintiff businesses, and (b) those plaintiffs who are principals of those businesses.

217.    The right to be free from indentured servitude is an enumerated right in the United States Constitution, and is not merely a "second-class" right which may be brushed off, as defendants have done.

218.    The EEOs forcibly compelled establishments of all varieties, including sole proprietorships, as well as their employees, to engage in labor, and to incur costs, in engaging in

40

enforcement efforts on behalf of the defendants, under the coercive threat of penalties and potentially crippling fines for violations thereof.

219.    Purported guidance which purportedly had employees check vaccination status and to make exemption determinations at the door, were without legal authority, were ill conceived, were coercive of employees, owners, and individuals, and violated their Thirteenth Amendment rights.

220.    More specifically, the EEOs require and/or required all covered entities to check the vaccine status and identification of each and every patron and/or employee walking through the door, with very limited exceptions.

221.    Each and every individual entering business premises, who was not a member of an excepted class, had to be examined for proof of vaccination by the plaintiff businesses, their principals, and/or their employees under threat of governmental coercion, and against their will.

222.    Such obligations create significant additional labor for the plaintiffs and others who are similarly situated, increased costs for the business defendants, earned no additional pay for their employees, may or have forced employees out of work, and will cause productivity losses to the business plaintiffs and those similarly situated.

223.    All such burdens resulted from executive fiat, and were not the acts of the Legislature, thus distinguishing them from acts such as seeking proof of age when buying alcoholic drinks.

224.    Another distinction is that unlike proof of age, the plaintiffs had conscientious and good-faith beliefs that compelling their patrons to provide proof of vaccination, on pain of being denied service, including the vast majority of the African-American community, is improper and unlawful.

41

225. As a result, thereof, businesses, including sole proprietorship, and their employees, were compelled by the EEO to serve in the capacity of Mayoral enforcement officers without compensation, under the coercive threat of crippling fines, and in violation of Plaintiffs' conscientious beliefs and legal rights not to engage in racial and other forms of discrimination.

226. Such coercive forced labor of businesses and, through such businesses, their owners, principals, managers, and employees, constituted a violation of the Thirteenth Amendment's prohibition against indentured servitude, and caused damage.

## SEVENTH COUNT
### (Equal Protection, Compulsory Discrimination)

227. The plaintiffs repeat and reassert each and every allegation above, as if fully set forth herein at length.

228. The EEO compelled businesses to engage in conduct which discriminates against individuals on numerous protected bases, including their religious preferences, their healthcare choices, and their race; each of which is protected by various federal, state, and local statutes, codes and regulations.

229. Plaintiffs were irrationally treated differently from others who are similarly situated, such as hotels, banks, and residential high rise buildings, which are not covered by the EEO despite posing indistinguishable or greater putative risks, and such prohibited differential treatment is based on an impermissible classification with the discriminatory intent of harming certain business and compelling certain businesses to serve at the whim of the Mayor, contrary to other businesses--such as professional sports teams, professional artists, hotels, and banks--upon which the Mayor's favor shines favor, even though such favoritism will likely subject the plaintiff businesses (not to mention the City itself, at taxpayer expense, including the plaintiff taxpayers

42

themselves) to lawsuits for the discriminatory conduct being forcibly imposed on them by the EEO.

230.     The EEO also was intended to be applied in a discriminatory fashion, treating plaintiffs' businesses differently than businesses outside of New York City including similar businesses in other large cities in the State of New York and the United States, without consideration of the effectiveness of other less onerous State and Federal regulations and guidelines that have heretofore been in effect.

231.     There can be no legitimate government interest in compelling plaintiffs and others to violate laws against discrimination, regardless of classification, even more particularly when such demand arises from executive fiat or decree, as is the case here, and not from Legislative action, and caused damage.

## EIGHTH COUNT
### (Procedural and Substantive Due Process in General)

232.     The plaintiffs repeat and reassert each and every allegation above, as if fully set forth herein at length.

233.     The plaintiffs have a fundamental property interest in conducting lawful business activities, protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, which includes the freedom to earn a living by any lawful calling and to pursue a livelihood or vocation.

234.     The plaintiffs have a right to operate their businesses free of arbitrary deprivation by the defendants and threats of colossal penalties, and employees have a right to employment without coercion or penalty for refusing EUA vaccines. Nevertheless, through the EEOs,

43

defendants impaired the plaintiffs' liberty and property interests in their businesses by expressly depriving their rights and liberties in lawfully operating their businesses.

235.    The plaintiffs have a right to be free from executive actions of the Mayor, who used his self-perpetuated emergency powers to draw irrational distinctions between those exempted from the EEO and those subject thereto, who irrationally forces the unvaccinated outdoors when they pose no real threat to the vaccinated indoors, who fails to exempt those with religious, medical, and other bona fide and legitimate reasons--such as natural immunity--from the EEO, and who destroys the availability of important services--such as services to the underserved Autistic spectrum community and to firefighters and veterans suffering with PTSD--via ukase.

236.    The plaintiffs' liberties extend to their personal choices central to individual dignity and autonomy, including intimate choices that define personal identities and beliefs, including, without limitation, religious, medical, social, and economic choices.

237.    The EEO did not afford the plaintiffs a constitutionally adequate hearing to present their case for the businesses not to be impaired, and compels the plaintiffs to operate their businesses with an entire class of patrons and customers eliminated when there are alternate measures to properly address the health and safety issues presented by COVID-19.

238.    The Mayor failed to comply with constitutional requirements in connection with plaintiffs' rights and liberties as they relate to plaintiffs' businesses and proceeded on the basis of procedurally deficient and substantively unlawful processes which deprived the plaintiffs of the property rights and their fundamental rights to (and ability to) operate the businesses without unconstitutional government overreach.

239.    The procedural and substantive due process violations described above are the result of a custom, practice, or policy of the Mayor claimed to be authorized by color of State law

and which has denied the plaintiffs their rights, privileges, and immunities guaranteed under the Constitution and laws of the United states and secure by 42 U.S.C § 1983, particularly depriving the plaintiffs of their right to property under the Fifth Amendment and their right to Due Process and Equal Protection under the laws guaranteed by the Fourteenth Amendment.

240.    As a result of the Mayor's wrongful acts, the plaintiffs have suffered and will continue to suffer damages, including humiliation, mental pain, anguish, and associated consequential damages.

241.    The plaintiffs have no adequate remedy at law and will suffer irreparable harm to their constitutional rights in the absence of an injunction barring enforcement of the EEO or any similarly promulgated EEO.

## NINTH COUNT
### (Lack of Authority under City Charter, Administrative Code, or State Statute)

242.    The plaintiffs repeat and reassert each and every allegation above as if fully set forth herein at length.

243.    The Mayor's actions were without legal authority under New York Statute, New York City Charter, in the Mayor exceeded his authority subjecting private citizens, who are not employees of the City's Executive Branch who may be reached by Emergency Executive Orders of the Mayor.

244.    The Mayor's actions were not permitted by State statute, since no statutory authority existed which provided the Mayor with emergency executive powers to take affirmative steps which generally fall within the province of the State legislature, such as mandating vaccinations, establishing exceptions, or creating coercive measures in the purported best interests of the health, safety, and welfare of the citizens to cause them to choose between suffering the

coercive measures or becoming vaccinated. Indeed, established statutory exceptions such as religious exemptions were ignored and violated by the EEO.

245.    The Mayor and City have admitted that they relied on Executive Law § 24 as the source of their emergency authority to promulgate the EEOs, yet no such authority existed under such law at any or all times in question.

246.    For such reasons, the EEOs were void *ab initio* as being *ultra vires* acts of the Mayor, and their enforcement caused the plaintiff damages, and will continue causing damages in the future is reintroduced in a similar manner, without proper legal authority.

## TENTH COUNT
### (Privileges and Immunities Clause/Declaratory Judgment)

247.    The plaintiffs repeat and reassert each and every allegation above, as if fully set forth herein at length.

248.    To the extent that the former Mayor had the authority to promulgate EEO 98, and thereafter to continue taking actions under such original emergency authority, and/or that the Mayor has done so since, the conditions which created such emergency no longer exist, yet the Mayor continued with his purported emergency authority. Emergency edicts that curtail fundamental rights must be strictly scrutinized, more so as they go from weeks to months to years.

249.    In continuing to claim emergency powers, with respect to the EEOs, including any promulgated hereafter, the Mayor (or his successor) shall continue to reserve unto himself the purported right to curtail the liberty and property rights of the citizens of the City under the United States Constitution, such that he has exceeded any legitimate police power.

250.    While *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905), even as cabined by later case law, may provide a philosophical constitutional basis for the declaration of

46

health emergencies, the law is devoid of any suggestion contradicting the  principle that the police power of the States and their political subdivisions must, at some point, terminate such emergency powers in order to protect the rights of national citizenship belonging to the people of such states and political subdivisions. At some point, the States and political subdivisions thereof must bear the burden of proving the continuing constitutionality of their emergency powers.

251.    Moreover, the Statute preempts the Mayor and former Mayor's EEOs, since they attempted to coerce individuals to become vaccinated despite such individuals' preemptive federal statutory right to say "no" under the Statute's 'informed consent' provision, and those of the related regulation set forth above.

252.    Additionally, the former Mayor and Mayor acted without legal authority in promulgating the subject EEOs 225 and those coming thereafter as all were promulgated while a state of emergency did not exist in the State of New York, in violation of state statutes set forth above.

253.    Under such circumstances, any further conduct of the Mayor in attempting to enforce or enact purported emergency powers which in any way touch the liberty and/or property interests of the plaintiffs and/or the other residents of the City and/or the State--including any and all such  restrictions currently in existence in any and all EEO's promulgated by the Mayor and/or the former Mayor pursuant to such purported authority--violates their Privileges and Immunities of national citizenship, protected pursuant to the Fourteenth Amendment of the United States Constitution, and/or otherwise violates their rights under the Due Process Clause and/or the Equal Protection Clause of the United States Constitution, and otherwise violates the Supremacy Clause of the United States Constitution, Art VI cl. 2, and/or state statutes.

47

254. To the extent that The Slaughter-House Cases, 83 U.S. (16 Wall.) 36 (1872), and its progeny, would deprive the Courts of an enforcement mechanism under the Privileges and Immunities Clause of the Fourteenth Amendment, such case or cases should be expanded, abrogated, narrowly construed, confined to their own facts, or overruled, since without such authority as intended by the drafters of the Constitution, courts applying the Constitution are powerless to curtail and to place guardrails on States and their subdivisions from permanently declaring emergencies, which then may be used to intrude perpetually upon the liberty and property interests associated with national citizenship (and thus even citizenship of those within a particular State) that are protected by the United States Constitution.

255. Further, under the circumstances, any further conduct of the Mayor in attempting to enforce or enact purported emergency powers which in any way touch the liberty and/or property interests of the residents of other States--including those currently in existence pursuant to such purported authority--would violate the Privileges and Immunities of citizens of such States, pursuant to the Article IV, Section 2, Clause 1 of the United States Constitution. In this case, such restrictions also harm plaintiffs.

256. The many difficult legal issues arising from the COVID-19 pandemic, which touch upon alleged deprivations and curtailments of liberty and property interests of citizens of the States and the nation, and the misuse of emergency declarations to govern over a very long period of time, have made abundantly clear the need for a revisiting of the traditional deference to State action (especially purely executive action) in instances of emergency, lest such action be abused, and the citizenry thereof be molested in terms of Constitutional rights.

257. The basis for the Mayor's taking emergency powers for himself, to the extend it ever existed, no longer exists, yet the Mayor had engaged in an ongoing and damaging campaign

48

of attacking the  enumerated constitutional rights and the fundamental life, liberty and property interests of the residents and workers within the City, as if the emergency continued to exist at a high level, and arrogated unto himself individually the power to run the City for a period of years with no end in sight under the guise of "COVID-emergency forever" rulemaking authority.

258.    One cannot help but conclude that the actions of the Mayor were becoming indistinguishable from those of a tyrant, who is so enamored and intoxicated with his perceived power and infallibility, that he cannot restrain himself from increasing such power, even as the basis for its grant to him by the people--to the extent it ever existed--no longer exists. This is true regardless of whether the Mayor believes he was well-motivated, since under our system of government, that putative motive does not allow the Mayor to become a one-man permanent government, "l'etat c'est moi". The result is that the citizens such as plaintiffs lost their constitutionally rights at the hands in despotic fashion, by Mayors who believed themselves to have no constitutional guardrails on their perceived emergency authority.

259.    For all these reasons, the plaintiffs seek this Court's urgent help, as well as a determination as to when, why, and how the police powers of the States and their subdivisions to declare an emergency end under the United States Constitution, and when the protections of the Privileges and Immunities Clause of the Fourteenth Amendment and/or the Due Process and/or Equal Protection Clauses of the Fourteenth Amendment begin--which, the plaintiffs are convinced, is here and now.

WHEREFORE, the plaintiffs demand judgment declaring the following pursuant to 22 U.S.C. § 220, as follows:

   A. Declaring that the EEOs violate the Privileges and Immunities Clause of the 14th
      Amendment, and reversing *The Slaughterhouse Cases;*

49

B.  Declaring the EEOs to be void *ab initio* for violating the Supremacy Clause;

C.  Declaring the EEOs to be void *ab initio* as violating the Due Process Clause of the Fourteenth Amendment;

D.  Declaring the EEOs to be void *ab initio* as violating the Equal Protection Clause of the Fourteenth Amendment

E.  Permanently enjoining and restraining the Mayor and the City of New York from enforcing the subject EEOs including, all presently existing EEOs arising from the original emergency powers;

F.  Declaring the subject EEOs to have violated state statutory authority, thus rendering them void;

G.  Declaring the subject EEOs to be facially unconstitutional, and void;

H.  Awarding compensatory, punitive damages and reasonable attorneys' fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988;

I.  Awarding injunctive relief and other equitable relief, as provided under 42 U.S.C. § 1983

J.  Permanently restraining and enjoining the Mayor from taking any further actions to enforce or to promulgate new measures under his emergency powers as related to COVID-19, including new measures of enforcement of any and all existing EEOs, promulgated thereunder, as same exceeds the authority of a State power, and violates the United States Constitution, including, but not limited to, the Privileges and Immunities clause of the Fourteenth Amendment of the United States Constitution.

K.  Granting such other and further relief as may be equitable and just under the circumstances.

50

## JURY DEMAND

The plaintiffs hereby demand a trial by jury of twelve persons on all Counts so triable.

**MURRAY-NOLAN BERUTTI LLC**
Attorneys for the Plaintiffs

*Ronald A. Berutti*

By:_____
    Ronald A. Berutti

Dated:   July 5, 2022

51